# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

In the Matter of the Detention of:

TROY BELCHER,

               Petitioner.

No.  47328-3-II

ORDER GRANTING MOTION TO
PUBLISH

      Respondent State of Washington has moved to publish the court's October 4, 2016 opinion.

Petitioner Troy Belcher opposes the motion.  The Court has determined that the opinion in this

matter satisfies the criteria for publication.  It is now

      **ORDERED**, that the motion to publish is granted and the opinion's final paragraph

reading:

> A majority of the panel having determined that this opinion will not be printed
> in the Washington Appellate Reports, but will be filed for public record in accordance
> with RCW 2.06.040, it is so ordered.

is deleted.  It is further

      **ORDERED** that this opinion will be published.

      **PANEL:**  Jj. Lee, Melnick, Sutton.

      **DATED** this 22 day of November, 2016.

                                             Melnick, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>TROY BELCHER,<br><br>                Petitioner. | No. 47328-3-II<br><br><br>UNPUBLISHED OPINION |

MELNICK, J. — Troy Belcher appeals the trial court's denial of his petition for unconditional release and order for continued involuntary civil commitment as a sexually violent predator (SVP) under chapter 71.09 RCW. Belcher alleges his commitment violates due process; insufficient evidence existed to prove both that Belcher was likely to commit a sexually violent offense if released and that he suffered from a mental abnormality; and the State's expert lacked the qualifications to testify. We affirm.

## FACTS

### I. BACKGROUND

Belcher has two juvenile adjudications finding him guilty of sex offenses committed when he was 13 and 15 years old. He committed the first offense in 1998. He approached a 13-year-old girl, L.C., who was babysitting at a park. He spoke with her, followed her to the children's home, and tried to invite himself inside. L.C. would not let him in, but gave him her phone number in an effort to make him leave. A few minutes later, L.C. answered a knock on the door and Belcher forced his way inside the house. Belcher told L.C. he wanted to have sex with her. She

refused and tried to push him away. Belcher raped L.C. Belcher stopped and left the house when one of the children interrupted the assault by knocking on the door. Belcher was subsequently found guilty in juvenile court of rape in the second degree by forcible compulsion. In November 1998, Belcher received a manifest injustice sentence and received a 65-week commitment to the Department of Juvenile Rehabilitation (DJR).

While still on supervision for his first sex offense, Belcher committed his second sexually violent offense. In April 2000, 13-year-old J.A. encountered Belcher while she walked to a friend's house. Belcher offered to show J.A. a shortcut through the woods and J.A. agreed to follow him. Belcher began to kiss J.A. when they arrived in the woods. He pulled her pants and underwear down to her knees and pushed her to the ground. Belcher then pulled down his pants, straddled her, and warned J.A. that she would not get hurt if she did not scream. J.A. managed to push Belcher off of her and run away. Belcher admitted to police that he pulled down J.A.'s pants and underwear, he "planned on having sex with her," and he "had tried to rape J.A." Clerk's Papers (CP) at 5. Belcher was found guilty in juvenile court of attempted rape in the second degree. In January 2001, Belcher received a manifest injustice sentence and was committed to DJR for 256 weeks. They placed Belcher at the Green Hill School institution.

In 2004, Belcher, then 19 years old, approached another Green Hill resident and asked about having L.C. killed or put in a coma. The State charged Belcher as an adult with solicitation to commit murder in the first degree and intimidating a witness. Belcher pleaded guilty to intimidating a witness and received a sentence of 27 months of incarceration in prison and 9 to 18 months of community custody.

In December 2007, while Belcher was still serving his sentence for his 2004 conviction, the State petitioned for Belcher's civil commitment as a SVP. Belcher was transferred to the

McNeil Island Special Commitment Center (SCC) pending his trial on the commitment petition. *In re Det. of Belcher*, noted at 173 Wn. App. 1021, 2013 WL 634536.

Belcher went to trial and the jury returned a verdict finding that the State had proven beyond a reasonable doubt that Belcher was a SVP. The trial court committed him to the SCC. Belcher appealed, and we affirmed. *Belcher*, 2013 WL 634536.

On June 29, 2012, the trial court completed its annual review. It ordered Belcher's continued custody as a SVP until further order from the court.

II.     UNCONDITIONAL DISCHARGE TRIAL

In May 2014, Belcher petitioned the trial court for an unconditional discharge trial pursuant to chapter 71.09 RCW. He argued that probable cause existed under RCW 71.09.090 because he made a *prima facie* showing that he no longer met the definition of a SVP. He asserted in the petition that his qualified expert, Dr. Brian Abbott, assessed Belcher as no longer meeting the commitment criteria as a SVP because of his "positive response to continuing treatment." CP at 82. Belcher included Dr. Abbott's evaluation, Dr. Abbott's declaration, and depositions from four SCC staff members as support for his petition.

The State filed a show cause petition on whether probable cause existed to prove Belcher's condition had so changed that he no longer met the definition of a SVP, or whether release to a less restrictive alternative would be in Belcher's best interest and conditions could be imposed to protect the community. The State requested that the trial court continue Belcher's civil commitment as a SVP.

Belcher opposed the State's show cause petition, arguing that the State failed to "establish a *prima facie* case for continued confinement." CP at 304. The trial court held a show cause hearing and granted Belcher's petition for an unconditional discharge trial.

Belcher waived his right to a jury trial and the matter proceeded to a bench trial. The following facts are from the trial court's findings of fact.[1] Belcher did not contest the existence of two sexually violent convictions, nor that they constituted sexually violent offenses pursuant to RCW 71.09.020(17).[2]

Dr. Brian Judd, a certified sex offender treatment provider in Washington who specializes in the evaluation of sex offenders, gave his opinion about Belcher's current condition. Dr. Judd reviewed over 3,789 pages of documentation regarding Belcher, including behavioral management reports, observation reports, progress notes, medical records, infraction records, and observations of his participation in treatment. He also interviewed Belcher twice. Dr. Judd considered Belcher's "mental state, the crimes that had occurred and the crimes that he was responsible for, his general mental capacity and whether there existed a mental disorder. Dr. Judd evaluated [Belcher] using the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), the Hare Psychopathy Checklist Revised (PCL-R), as well as the Violence Risk Appraisal Guide-Revised (VRAG-R) actuarial instrument." CP at 850. Dr. Judd no longer diagnosed Belcher with "Paraphilia NOS (Non-consent),"[3] and provisionally diagnosed him with "Specified Paraphilic Disorder (Non-consent), and Rule-Out Other Specified Paraphilic Disorder (Non-consent), In Remission." CP at 851. Dr. Judd opined that Belcher continued to meet the "criteria for Antisocial

---

[1] Belcher assigns error to specific findings of fact but does not address the findings in his argument section of his brief or why the findings are inaccurate. He occasionally cites to a finding of fact. Accordingly, we consider the findings to be verities on appeal because they remain unchallenged. *State v. Bonds*, 174 Wn. App. 553, 562, 299 P.3d 663 (2013).

[2] The statute was amended in 2015, however, the amendments do not affect our analysis in this case.

[3] Dr. Judd previously diagnosed Belcher with "Paraphilia NOS (Non-consent)" at the first civil commitment trial. CP at 851.

Personality Disorder with the presence of high levels of psychopathy which meets the definition of a mental abnormality" as defined in RCW 71.09.020(8). CP at 851.

Dr. Judd further testified that his diagnosis of Belcher's mental abnormality, "that being a congenital or acquired condition affecting the emotional or volitional capacity, which predisposes the person to the commission of criminal sexual acts in a degree constituting such person a menace to the health and safety of others." CP at 853. In assessing Belcher's risk of likelihood that he would commit predatory acts of sexual violence if not confined to a secure facility, Dr. Judd based his opinion on the VRAG-R. His evaluation placed Belcher at the 95.5 percentile compared to the standardized sample, which meant that "[s]eventy-six percent of individuals with similar scores recidivated at 5 years of time at risk and 87 percent recidivated at 12 years of time at risk." CP at 853. Dr. Judd also considered other factors empirically associated with risk, including Belcher's level of psychopathy. On the PCL-R, Dr. Judd gave Belcher a score of 31 out of a possible 40, which showed that Belcher had a much higher risk of both general and sexual recidivism. Dr. Judd testified that future acts of sexual violence by Belcher would also likely be predatory.

Dr. Abbott testified on Belcher's behalf. He opined that "Belcher did not suffer from any mental abnormality or personality disorder and has never suffered from one."[4] CP at 855.

---

[4] The trial court found that Dr. Abbott's testimony "lacked credibility" because his testimony at trial conflicted with his written testimony to the court that indicated Belcher "had previously met the definition of a [SVP], but had undergone a significant change in his mental condition through positive response to continuing participation in treatment, and consequently no longer met the definition of a SVP." CP at 855.

On February 11, 2015, the trial court concluded Belcher continued to meet the definition of a SVP and ordered Belcher to remain committed to the SCC. Belcher appeals.

ANALYSIS

I. RIGHTS AND PROCEDURES AFFORDED TO INDIVIDUALS FACING SVP COMMITMENT

"It is well settled that civil commitment is a significant deprivation of liberty, and thus individuals facing SVP commitment are entitled to due process of law. *In re Det. of Morgan*, 180 Wn.2d 312, 320, 330 P.3d 774 (2014). The "'process due'" to a person subject to a SVP petition is the procedure allocated by "'the statute which authorizes civil incarceration.'" *In re Det. of Strand*, 167 Wn.2d 180, 187, 217 P.3d 1159 (2009) (quoting *In re Det. of Martin*, 163 Wn.2d 501, 511, 182 P.3d 951 (2008)). Individuals facing commitment have, among other rights, the right to a trial, the right to an expert to conduct an evaluation on his or her behalf, and to the right to the assistance of appointed counsel. RCW 71.09.050.

When the Washington Supreme Court "upheld the SVP civil commitment scheme against a substantive due process challenge," it noted the legislature's "'honest recognition of the difficulties inherent in treating those afflicted with the mental abnormalities causing the sex predator condition.'" *Morgan*, 180 Wn.2d at 319 (quoting *In re Pers. Restraint of Young*, 122 Wn.2d 1, 31, 857 P.2d 989 (1993)). Yet, the court reasoned that the "legislature found that 'the exceptional risks posed by sexual predators, and the seemingly intractable nature of their illness, necessitates a specially tailored civil commitment approach.'" *Morgan*, 180 Wn.2d at 319 (quoting *Young*, 122 Wn.2d at 10). The court emphasized that "SVP proceedings focus not on 'the criminal culpability of . . . past actions,' but on 'treating [SVPs] for a current mental abnormality, and protecting society from the sexually violent acts associated with that abnormality.'" *Morgan*, 180 Wn.2d at 319-20 (quoting *Young*, 122 Wn.2d at 21).

Commitments are indefinite, persisting "'until such time as the person's mental abnormality or personality disorder has so changed that the person is safe either (a) to be at large, or (b) to be released to a less restrictive alternative as set forth in RCW 71.09.092.'" *In re Det. of Petersen*, 138 Wn.2d 70, 78, 980 P.2d 1204 (1999) (quoting former RCW 71.09.060(1) (1998)). Once a person has been committed as a SVP, the State is required to conduct an annual review to determine whether the individual continues to meet the definition of a SVP. RCW 71.09.070. A person found to be an SVP has two ways to obtain release from the commitment. First, the State may authorize a detainee to file a petition for either unconditional release or transfer to a less restrictive alternative (LRA) if the detainee has "so changed" that he either no longer meets the definition of SVP or that a LRA is in the individual's best interest. RCW 71.09.090(1). Second, a SVP may petition, on the basis that he has "so changed" that he no longer fits the SVP definition or that a LRA is in his best interest, for unconditional release or transfer to a LRA without the State's agreement. RCW 71.09.090(2)(a).

The trial court holds a show cause hearing to determine whether a hearing shall be held. RCW 71.09.090(2)(a). At the show cause hearing, the State bears the burden of establishing by prima facie evidence "that the committed person continues to meet the definition of a sexually violent predator and that a less restrictive alternative is not in the best interest of the person and conditions cannot be imposed that adequately protect the community." RCW 71.09.090(2)(b).

The trial court must set a hearing under two circumstances. First, when the State fails to meet its burden. RCW 71.09.090(c)(i). Second, when there is probable cause to believe the petitioner's condition has changed and he or she no longer meets the definition of a SVP or a LRA would be in the petitioner's best interest and protection of the community can be accomplished with conditions. RCW 71.09.090(2)(c)(ii). To order a new trial, a licensed professional must

8

have current evidence that the SVP has had an identified physiological change or the SVP's changed mental condition is a positive response to continuing participation in treatment. RCW 71.09.090(4)(b).

At the hearing, the State must prove beyond a reasonable doubt that the SVP continues to meet the definition of a SVP. RCW 71.09.060(1). A SVP is "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). A sexually violent offense is defined as

> an act committed on, before, or after July 1, 1990, that is: (a) An act defined in Title 9A RCW as rape in the first degree, rape in the second degree by forcible compulsion . . . or (d) an act as described in chapter 9A.28 RCW, that is an attempt, criminal solicitation, or criminal conspiracy to commit one of the felonies designated in (a), (b), or (c) of this subsection.

RCW 71.09.020(17).

II.    DUE PROCESS VIOLATIONS

Belcher argues that there were numerous violations of his due process rights. First, he claims the State cannot use his juvenile adjudications as predicate offenses for his SVP commitment. Second, he claims the diagnostic tools used by the State's expert that predicted he was likely to commit a sexually violent offense violated his right to due process. Finally, Belcher claims that his commitment, based on the diagnosis of antisocial personality disorder alone, is insufficient to establish a mental abnormality. We disagree.

Belcher does not support his due process violation claims with any argument or analysis as to how or why they are unconstitutional. He does not argue what standard of review we should utilize in our analysis. RAP 10.3(a)(6). We generally consider an assignment of error waived if

9

the party fails to present argument or authority on the issue in its brief. *State v. Harris*, 164 Wn. App. 377, 389 n.7, 263 P.3d 1276 (2011). In addition, "Where a petitioner makes a due process challenge, '[N]aked castings into the constitutional seas are not sufficient to command judicial consideration and discussion.'" *State v. Johnson*, 179 Wn.2d 534, 558, 315 P.3d 1090 (quoting *State v. Blilie*, 132 Wn.2d 484, 493 n.2, 939 P.2d 691 (1997) (internal quotations removed)), *cert. denied*, 135 S. Ct. 139, 190 L. Ed. 2d 105 (2014). Belcher's arguments are better characterized as evidentiary challenges, and we address them as such.

A.    JUVENILE CONVICTIONS

Belcher argues that the involuntary commitment of individuals for sexually violent acts that occurred when they were juveniles is a violation of substantive due process.[5] "[S]ubstantive due process seems to have been gradually adopted as the shorthand for individual rights which are not clearly textual." Stephen Kanter, *The Griswold Diagrams: Toward A Unified Theory of Constitutional Rights*, 28 Cardozo L. Rev. 623, 669 n.170 (2006). We disagree.

At trial, Belcher did not challenge whether his juvenile adjudications constituted sexually violent offenses pursuant to RCW 71.09.020(17). We need not consider issues that are raised for the first time on appeal unless they are manifest constitutional errors. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007); RAP 2.5(a). "Accordingly, an appellant may raise an error for the first time on appeal if he or she demonstrates (1) that the error is manifest and (2) that the error is truly of constitutional dimension." *In re Det. of Brown*, 154 Wn. App. 116, 121, 225 P.3d 1028 (2010). A manifest constitutional error is subject to a constitutional harmless error analysis.

---

[5] Belcher asserts a due process violation, but he is really challenging the constitutionality of chapter 71.09 RCW and the use of juvenile adjudications as predicate offenses for a SVP commitment.

*Brown*, 154 Wn. App. at 121. Here, it is clear that Belcher's challenge of a due process violation may constitute manifest constitutional error.

Substantive due process "requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha v. Louisiana*, 504 U.S. 71, 79, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992). The constitutionality of the State's "police power" to subject certain citizens to involuntary confinement is firmly settled. *Young*, 122 Wn.2d at 27 (quoting *Addington v. Texas*, 441 U.S. 418, 426, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)); *see also United States v. Salerno*, 481 U.S. 739, 748-49, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987) ("the government may detain mentally unstable individuals who present a danger to the public."). Washington's "statutory scheme" that allows ongoing confinement of SVPs "comports with substantive due process" because the annual review process serves to identify those detainees who are no longer mentally ill and dangerous. *State v. McCuistion*, 174 Wn.2d 369, 388, 275 P.3d 1092 (2012).

To the extent that Belcher argues that his confinement is unconstitutional because it is based on sexually violent offenses he committed as a juvenile, his challenge is incredibly vague. He seems to equate his detention as a SVP with that of juveniles who are imprisoned or virtually imprisoned for life. However, the criminal cases to which Belcher cites are distinguishable because a SVP commitment is a civil proceeding and the "SVP statute is resolutely civil." *In Det. of Ticeson*, 159 Wn. App. 374, 381, 246 P.3d 550 (2011). Further, the commitment under the SVP statutory scheme will only last as long as the SVP continues to meet the criteria for commitment. A SVP may request show cause hearings for release or a LRA. RCW 71.09.090(2)(a). There are also mandatory annual reviews of an SVP's confinement. RCW 71.09.070. The United States

Supreme Court has upheld SVP involuntary commitment statutes on substantive due process grounds if

> (1) "the confinement takes place pursuant to proper procedures and evidentiary standards," (2) there is a finding of "dangerousness either to one's self or to others," and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'"

*Kansas v. Crane*, 534 U.S. 407, 409-10, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 357-58, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997)). Washington is in accord. *In re Det. of Thorell*, 149 Wn.2d 724, 731-32, 72 P.3d 708 (2003).

In addition, juvenile adjudications have been upheld as proper predicate offenses for commitment under the SVP statutes, as the legislature intended. *In re Det. of Anderson*, 185 Wn.2d 79, 89, 368 P.3d 162 (2016). RCW 71.09.020(17) defines what constitutes a sexually violent offense. There is no exclusion for juvenile offenses.

In support of his argument, Belcher primarily relies on a series of United States Supreme Court cases that addressed how juvenile sentences may violate the Eighth Amendment's ban on cruel and unusual punishment. *Roper v. Simmons*, 543 U.S. 551, 568, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Graham v. Florida*, 560 U.S. 48, 76, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). These cases all involved criminal sentences, i.e. capital punishment or life without parole. They also discussed the general characteristics of juvenile crimes and those who commit them.

These cases are distinguishable from the present situation. A SVP must have not only a prior charge or conviction for a crime of sexual violence; a SVP must also currently suffer from "a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). Therefore, Belcher's argument fails.

B.      LIKELIHOOD TO REOFFEND

Belcher argues that his due process rights were violated because the State presented insufficient evidence to establish that he was more likely than not to commit a sexually violent offense if not confined. Belcher argues the State's expert based his assessment of Belcher's risk on an assessment not intended for analysis of juvenile offenses. Belcher couches this argument as a constitutional violation when it is actually a sufficiency of the evidence argument. And sufficient evidence exists to support his continued commitment.

The same standard is utilized in sufficiency of the evidence challenges in SVP commitment proceedings as is used in criminal cases. *Thorell*, 149 Wn.2d at 744. Sufficient evidence exists if, when viewing the evidence in the light most favorable to the State, any rational trier of fact could find the essential elements beyond a reasonable doubt. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). A defendant claiming insufficiency of the evidence admits the truth of the State's evidence and all inferences that reasonably can be drawn from it. *Hosier*, 157 Wn.2d at 8. Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). Deference is given to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Martinez*, 123 Wn. App. 841, 845, 99 P.3d 418 (2004).

On appeal from a bench trial, our review is limited to determining whether substantial evidence supports the trial court's findings of fact, and whether the findings support the conclusions of law. *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). Because Belcher has not assigned error to the trial court's findings of fact, they are considered verities on appeal. *State v. Bonds*, 174 Wn. App. 553, 562, 299 P.3d 663 (2013). We review challenges to

a trial court's conclusions of law de novo. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

Belcher challenges Dr. Judd's opinion regarding Belcher's risk of recidivism and Dr. Judd's use of the VRAG-R. He argues this tool only demonstrated Belcher's likelihood of committing a future violent offense and not a sexually violent one. We disagree.

Actuarial instruments used in SVP cases appear to be generally accepted by the relevant scientific community. *In re Det. of Strauss*, 106 Wn. App. 1, 8-9, 20 P.3d 1022 (2001), *aff'd sub nom.*, *Thorell*, 149 Wn.2d 724. "[P]sychologists who are knowledgeable about assessing the risk of recidivism among sex offenders generally accept the actuarial instruments used in this case." *Strauss*, 106 Wn. App. at 8. In *Strauss*, the defense's expert "admitted using actuarial instruments such as the VRAG in sexual predator cases." 106 Wn. App. at 8. Further, "[s]cientific literature and secondary legal authority also support the view that the relevant scientific community generally accepts the three actuarial instruments in question as part of an overall risk assessment."[6] *Strauss*, 106 Wn. App. at 8.

Even though Dr. Judd used the VRAG-R, he did not make his assessment of Belcher solely on this tool. The trial court recognized the fact it was merely one piece of Dr. Judd's clinical evaluation. The trial court also found that Dr. Judd relied on extensive records that included behavioral management reports, observation reports, progress notes, medical records, infraction records, observations of Belcher's participation in treatment, as well as two interviews with Belcher.

---

[6] The three actuarial instruments used were the Minnesota Sex Offender Screening Tool (MnSOST), the Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR), and the VRAG. *Strauss*, 106 Wn. App. at 4.

Further, the trial court found that Dr. Judd's testimony expressed that the use of the VRAG-R is accepted in the relevant scientific community and that it did not apply solely to violent recidivism, but applied to sexually violent recidivism as well. Dr. Judd also utilized the PCL-R and the Hare Psychopathy checklist. Dr. Judd utilized all of the above actuarial tools and information in arriving at his professional assessment of Belcher. This information, contained in the trial court's findings of fact, supported its conclusion of law that Belcher was likely to engage in predatory acts of sexual violence if he was not confined in a secure facility. Therefore, when viewing the evidence in the light most favorable to the State, a rational trier of fact could find that Belcher continued to meet the definition of a SVP beyond a reasonable doubt.

### C. MENTAL ABNORMALITY

Belcher argues that the trial court violated his right to due process because the State failed to present sufficient evidence of Belcher's mental abnormality to meet the statutory definition of a SVP when Dr. Judd diagnosed him with antisocial personality disorder with a high level of psychopathy. Again, Belcher attempts to couch a sufficiency argument as a due process violation. We disagree.

As previously stated, our review is limited to whether the trial court's findings support its conclusions of law. *Homan*, 181 Wn.2d at 105-06. We review challenges to a trial court's conclusions of law de novo. *Gatewood*, 163 Wn.2d at 539.

To commit an individual as a SVP, the State must prove beyond a reasonable doubt that the person has "been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality *or* personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18) (emphasis added). "'[M]ental abnormality' and 'personality disorder' are two distinct means of establishing the

15

mental illness element in SVP cases." *In re Det. of Halgren,* 156 Wn.2d 795, 811, 132 P.3d 714 (2006). RCW 71.09.020(8) defines mental abnormality as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to the commission of criminal sexual acts in a degree constituting such person a menace to the health and safety of others." Personality disorder is defined by the statute as:

> an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has onset in adolescence or early adulthood, is stable over time and leads to distress or impairment. Purported evidence of a personality disorder must be supported by testimony of a licensed forensic psychologist or psychiatrist.

RCW 71.09.020(9).

"'A diagnosis of a mental abnormality or personality disorder is not, in itself, sufficient evidence for a [factfinder] to find a serious lack of control.'" *In re Det. of Post*, 145 Wn. App. 728, 755, 187 P.3d 803 (2008) (quoting *Thorell*, 149 Wn.2d at 761-62), *aff'd*, 170 Wn.2d 302, 241 P.3d 1234 (2010). However, such a diagnosis coupled "with evidence of prior sexually violent behavior and testimony from mental health experts, which links these to a serious lack of control, is sufficient for a [factfinder] to find that the person presents a serious risk of future sexual violence and therefore meets the requirements of an SVP." *Thorell*, 149 Wn.2d at 762.

Belcher challenges Dr. Judd's diagnosis of antisocial personality with the presence of high levels of psychopathy as inadequate to satisfy the statute. However, the Washington Supreme Court rejected this argument in *Young*, 122 Wn.2d 1. The court noted that "antisocial personality disorder" is a recognized personality disorder defined by the DSM-III-R. *Young*, 122 Wn.2d at 37 n.12.

Dr. Judd opined that his diagnosis of Belcher's condition "meets the definition of a 'mental abnormality'" as defined in the statute. CP at 851. Dr. Judd further testified that Belcher's mental

abnormality was "a congenital or acquired condition affecting the emotional or volitional capacity, which predisposes the person to the commission of criminal sexual acts in a degree constituting such person a menace to the health and safety of others." CP at 853. Even though he testified that an antisocial personality disorder alone would not prove a mental abnormality, he continued to testify that Belcher's condition did meet the standard as defined in the statute particularly because of Belcher's level of psychopathy, which is a mental disorder as defined by the DSM-5.[7] Therefore, the trial court's conclusion of law that Belcher suffered from a mental abnormality was supported by its findings of fact.

Viewing the evidence in the light most favorable to the State, there was sufficient evidence to persuade a fair minded rational person beyond a reasonable doubt that Belcher suffers from a mental abnormality that makes him more likely to engage in predatory acts of sexual violence if he is not confined to a secure facility.

III.    SUFFICIENCY OF THE EVIDENCE

Belcher argues for the first time on appeal that even if antisocial personality disorder is a mental abnormality, the State presented insufficient evidence to prove it. He contends Dr. Judd lacked the necessary qualifications to provide the diagnosis. We reject this challenge.

Because Belcher did not object at trial, he has not properly preserved the issue for appeal, and we do not consider it. Issues raised for the first time on appeal need not be considered unless they are manifest constitutional errors. *Kirkman*, 159 Wn.2d at 926; RAP 2.5(a). Washington courts have "'steadfastly adhered to the rule that a litigant cannot remain silent as to claimed error

---

[7] Antisocial personality disorder satisfies the definition of a personality disorder *In re Det. of Sease*, 149 Wn. App. 66, 79-80, 201 P.3d 1078 (2009). An individual may also be committed as a SVP under the statute if his personality disorder makes him "likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18).

during trial and later, for the first time, urge objections thereto on appeal.'" *State v. Guloy*, 104 Wn.2d 412, 421, 705 P.2d 1182 (1985) (quoting *Bellevue Sch. Dist. No. 405 v. Lee*, 70 Wn.2d 947, 950, 425 P.2d 902 (1967)).

The rationale for this rule has been explained as follows:

> "[T]he trial court should be given an opportunity to correct errors and omissions at the trial level, and that it was the obligation of the parties to draw the trial court's attention to errors, issues, and theories, or be foreclosed from relying upon them on appeal.
>
> . . . .
>
> [Additionally,] opposing parties should have an opportunity at trial to respond to possible claims of error, and to shape their cases to issues and theories, at the trial level, rather than facing newly-asserted errors or new theories and issues for the first time on appeal."

*In re Det. of Audett*, 158 Wn.2d 712, 725-26, 147 P.3d 982 (2006) (quoting 2A Karl B. Tegland, WASHINGTON PRACTICE: RULES PRACTICE RAP 2.5, cmts. at 192 (6th ed. 2004)).

Belcher does not argue that RAP 2.5(a)(3) applies in this situation. Instead, Belcher claims that the evidence is legally insufficient because the trial court relied on the testimony and diagnosis of a psychologist who is not licensed as a forensic psychologist. In fact, Belcher cites no authority for the proposition that such a licensing scheme exists, and the State flatly rejects it. Ch. 18.83 RCW; Ch. 246-924 WAC. We reject Belcher's attempt to recast his evidentiary contention as a manifest constitutional error. *See Post*, 145 Wn. App. at 751 n.13.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Lee, P.J.

_____
Sutton, J.