IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50674-2-II |
| Respondent, | |
| v. | |
| JAMES LAURENCE LOUTHAN, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — James Louthan appeals from his unlawful possession of a controlled substance conviction, contending that the trial court erred by failing to suppress evidence seized during what Louthan asserts was an illegal search of his person. Because Louthan cannot meet his burden of showing that he had been seized prior to his arrest and because substantial evidence supports the trial court's finding that Louthan had consented to a search of his person, his contention fails, and we affirm his conviction.

FACTS

On June 20, 2017, the State charged Louthan with unlawful possession of a controlled substance. Before trial, Louthan moved to suppress evidence that had been seized from his person. The trial court held a CrR 3.6 hearing to address Louthan's suppression motion, at which Lewis County Sheriff's Deputy Stephen Heller and Louthan testified.

At the suppression hearing, Deputy Heller testified that he and Trooper Torson Iverson went to a store in Doty, Washington at approximately 3:00 a.m. on June 19, 2017, in response to a report of a man wearing a camouflage jacket staring toward the reporting party's home and

looking in the doors and windows of the closed store. Heller contacted Louthan outside the store as Iverson arrived. Iverson's dashboard camera recorded the officers' interaction with Louthan. The recording was played at Louthan's suppression hearing.

The video recording shows Louthan telling the officers that he got separated from a friend who was from the area and that he had not been able to contact his friend due to a lack of cellular phone service. Louthan also told the officers that he was a type 1 diabetic, did not have any insulin, and needed food. Louthan confirmed with Iverson that he had been walking down the highway. When Iverson told Louthan that the police had received a call stating that he had been walking down the center line of the highway, Louthan responded, "Yeah, right I mean I've been diabetic for thirty-five years, so my vision at night time is not worth a [expletive]." Ex. 1, at 2 min., 36 sec. through 2 min., 41 sec. Louthan also told Iverson that it was "freezing" out. Ex. 1, at 2 min., 41 sec. Iverson asked Louthan if he had a light; Louthan told Iverson that he had a light on his phone but that his phone battery was nearly dead.

Heller also testified at the suppression hearing that he ran a warrants check on Louthan while Louthan was speaking with Iverson. Heller found that Louthan had outstanding warrants but decided that he would not arrest Louthan based on those warrants. Heller further testified at the hearing that at this point in the interaction, he no longer had a suspicion that Louthan had been engaged in criminal activity and that the investigative portion of his stop had been completed. Heller stated that he continued interacting with Louthan to assist him in figuring out where to go that early in the morning.

The video exhibit shows Heller telling Louthan about the outstanding warrants and advising him to take care of the warrants. Heller then tries to call Louthan's friend, but no one

answers. Heller asked Louthan, "So, what's the plan here man? Do you need medical attention for your diabetes because you haven't eaten anything and your blood sugar is going to be [inaudible]?" Ex. 1, at 7 min., 26 sec. through 7 min., 33 sec. Louthan stated that he was "fine right now" but "I can't stand out here in the cold, I'm freezing man." Ex. 1, at 7 min., 43 sec. through 7 min., 47 sec. Louthan stated that he would try to wake up his friend's relatives to use their phone. Heller said that was not a good idea and that it was not a good idea to hang around there. Louthan stated that he would start walking down the highway then, to which Heller responded that he didn't want him walking down the highway. Heller then told Louthan:

> So what I'm going to do is I'm going to give you the option. I already know you got warrants. You got to get them taken care of, okay? I'm willing to give you a ride into Chehalis, alright? And I think you're willing. I'm willing to do that. I have to go that way anyway. But you got to listen to my [expletive] music, you got to wear a seatbelt, and I got to make sure you don't have any dope, and any weapons, or anything on you.

Ex. 1, at 8 min., 10 sec. through 8 min., 27 sec. Heller asked Louthan if his proposal sounded good, and Louthan said, "Yeah." Ex. 1, at 8 min., 31 sec. Louthan then asked Heller if he could call for another ride to come get him. Heller asked Louthan if there was someone else who could come get him. Louthan did not provide the name of another person, and Heller suggested that Louthan could try calling someone else after they arrived in Chehalis. Heller told Louthan that he was not going to confirm the warrants and that he was not taking him to jail. Iverson advised Louthan that if he was in Chehalis and his blood sugar kept going down, someone there could call for help. Heller again asked Louthan if the proposal sounded good, and Louthan again said, "Yeah." Ex. 1, at 9 min., 22 sec. Heller then searched Louthan and found a clear plastic bag containing suspected methamphetamines, which was located in a work glove in Louthan's back left pocket.

3

Louthan testified at the suppression hearing that his friend's sister owned the Doty store where he had been confronted by police and that his friend's mother lived next door to the store. Louthan stated that he was waiting for his friend to come find him at the store when the police officers arrived. Louthan further stated that he felt that Heller was not providing him with a real choice as to whether he could accept a ride to Chehalis because he believed Heller was not permitting him to either wake up his friend's relatives or to walk down the highway. Louthan also stated that he felt Heller had mentioned the warrants to coerce him to accept the offer of a ride to Chehalis.

The trial court denied Louthan's suppression motion and entered the following findings of fact and conclusions of law in support of its ruling:

### FINDINGS OF FACT

1.1 On June 19, 2017, Deputy Stephen Heller with the Lewis County Sheriff's Office responded to a location on Stevens Road in Doty at approximately 2:57 am for a suspicious person call to 911.

1.2 The named complainant reported that there was an unknown male standing under a street light, smoking a cigarette, staring at her house.

1.3 The male was also observed by the complainant looking through the windows of a closed business he was standing next to.

1.4 Law enforcement was also informed that a male had been seen in the area walking down the middle of the road.

1.5 Upon contact with the male, Dep. Heller was assisted by Trooper Torson Iverson.

1.6 Neither law enforcement officer used or displayed any aggressive action or words towards the male during their contact.

1.7 Up to the point of Louthan's arrest, he was never in custody.

4

1.8     The male indicated that he was from Oakville, and was in the Doty area hiking, but had become separated from his friend.

1.9     The male also stated he had been walking down the middle of the road.

1.10    The male had attempted to call his friend but his cellphone was not working in that area and the battery was dying.

1.11    Dep. Heller obtained the phone number for the friend the male was attempting to call and called the number on his cellphone.

1.12    Nobody answered the phone call from Dep. Heller.

1.13    The male advised that he was a type 1 diabetic and had not eaten for several hours.

1.14    The male refused the summoning of medical assistance offered by Dep. Heller.

1.15.   The male was verbally identified as James Louthan.

1.16    Louthan had active warrants from Grays Harbor County and Mason County, which were not confirmed and Louthan was never detained on.

1.17    When asked his plan, Louthan said that he wanted to wake up a person he knew that lived at the location where he was contacted and was told "no" by Dep. Heller.

1.18    After Louthan was told "no", he said "well, I'm going to walk down the highway," and was told "no" by Dep. Heller.

1.19    Dep. Heller offered to give Louthan a ride to Chehalis in his patrol vehicle so Louthan would have an easier time contacting someone he knew, because the temperature at the time was cold, because of Louthan's medical issues, and because of the reports of activity attributed to Louthan.

1.20    Dep. Heller advised Louthan that him remaining in the area was not a valid option.

1.21    Dep. Heller indicated through testimony that the purpose for him making this comment was due to the totality of the circumstances at the time.

1.22    Louthan had no other person to obtain a ride from other than Dep. Heller.

1.23 Dep. Heller advised Louthan that he was not going to book him on the warrants or even confirm them.

1.24 Dep. Heller testified that no reasonable suspicion of criminal activity existed on the part of Louthan.

1.25 Louthan decided to accept the offer from Dep. Heller for a ride into Chehalis.

1.26 As a condition of getting a ride to Chehalis in his vehicle, Dep. Heller advised Louthan that he would have to be searched for drugs and/or weapons.

1.27 Louthan consented to the search of his person before entering the vehicle.

1.28 During this search, Dep. Heller discovered a glove in Louthan's back pants pocket that contained a plastic baggie with a white, crystalline substance.

1.29 This substance was recognized as methamphetamine by Dep. Heller through his training and experience.

1.30 Louthan was placed under arrest for possession of a controlled substance.

1.31 Dep. Heller advised Louthan of his Miranda warnings from his standard issued card immediately after placing Louthan under arrest.

1.32 After advisement, Louthan stated that he had forgotten the methamphetamine was in his pants pocket.

**CONCLUSIONS OF LAW (3.6)**

2.1 Under the totality of the circumstances, Dep. Heller's actions with Louthan were a reasonable application of the community caretaking function of law enforcement up to the point Louthan consented to be searched.

2.2 The consent given by Louthan as a condition of getting a ride was valid.

2.3 Dep. Heller was allowed to require Louthan to be searched as a condition of giving him a ride in his patrol vehicle.

Clerk's Papers (CP) at 20-23.

Following the trial court's denial of his suppression motion, Louthan waived his jury trial right. The matter proceeded to a bench trial on stipulated facts, after which the trial court found Louthan guilty of unlawful possession of a controlled substance. Louthan appeals.

ANALYSIS

Louthan contends that the trial court erred in denying his motion to suppress evidence because the evidence seized by law enforcement officers was found during an illegal detention and search of his person. Alternatively, Louthan contends that even if he was lawfully detained, the trial court erred by not suppressing the evidence as beyond the scope of a protective weapons frisk. Because Louthan has not met his burden of proving that he was seized prior to his arrest and because substantial evidence supports the trial court's finding that Louthan had consented to a search of his person for drugs or weapons as a condition of receiving a ride from Deputy Heller, his contentions fail and we affirm his conviction.

I. STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress evidence to determine (1) whether substantial evidence supports the trial court's challenged findings of fact and, if so, (2) whether the findings support the trial court's conclusions of law. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'" *Garvin*, 166 Wn.2d at 249 (quoting *State v. Reid*, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)). Unchallenged findings are verities on appeal. *State v. Gaines*, 154 Wn.2d 711, 716, 116 P.3d 993 (2005). We review conclusions of law de novo. *Garvin*, 166 Wn.2d at 249.

## II. CHALLENGED FINDINGS OF FACT

Louthan assigns error to the trial court's findings of fact 1.7, 1.19, 1.21, 1.22, 1.25, 1.26, and 1.27. But Louthan does not directly address these findings in the argument section of his brief or explain how they lack substantial evidence in support. Of these findings, only two are fairly implicated by Louthan's legal arguments, 1.7 and 1.27. Accordingly, we treat the remaining findings as verities on appeal.[1] *In re Det. of Belcher*, 196 Wn. App. 592, 600 n.1, 385 P.3d 174 (2016) (citing *State v. Bonds*, 174 Wn. App. 553, 562, 299 P.3d 663 (2013)), *aff'd* 189 Wn.2d 280, 399 P.3d 1179 (2017).

A.   *Finding of Fact 1.7*

Finding of fact 1.7 states, "Up to the point of Louthan's arrest, he was never in custody." CP at 21. Although Louthan does not directly address this finding, he argues that he was unlawfully seized at the point of the police encounter when the officers' suspicions of criminal activity were dispelled but the officers did not allow him to knock on his friend's relatives' door, remain in the area, or walk down the highway. We disagree.

---

[1] Moreover, substantial evidence supports findings of fact 1.19, 1.21, 1.22, 1.25, and 1.26. Findings 1.19 and 1.21 are supported by Heller's testimony as to his reasons for offering Louthan a ride to Chehalis and for advising Louthan that his remaining in the area was not a valid option. Finding 1.22 is clearly supported by the video exhibit showing Heller unsuccessfully attempting to contact Louthan's friend and showing Heller ask Louthan if there was anyone else that could pick him up, to which Louthan did not provide any names. Finding 1.25 is also clearly supported by the video exhibit as it shows Louthan accepting Heller's offer of a ride to Chehalis. Whether Louthan's acceptance was voluntary under the circumstances is a separate question properly addressed through his challenge to finding 1.27 and conclusions of law 2.2 and 2.3. The video exhibit also shows Heller advising Louthan that he would be searched for drugs or weapons as a condition of accepting a ride to Chehalis and, thus, supports finding 1.26.

Although denoted as a finding of fact, the determination of whether a seizure had occurred is a mixed question of law and fact. *State v. Harrington*, 167 Wn.2d 656, 662, 222 P.3d 92 (2009). We give great deference to the trial court's resolution of differing accounts of the police encounter but review de novo whether those facts constitute a seizure. *Harrington*, 167 Wn.2d at 662.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution protect an individual's right to be free from unreasonable searches and seizures. *State v. Fortun-Cebada*, 158 Wn. App. 158, 168, 241 P.3d 800 (2010). "'[A]rticle I, section 7 of the Washington Constitution provides greater protection to individual privacy rights than the Fourth Amendment to the United States Constitution.'" *State v. Rankin*, 151 Wn.2d 689, 694, 92 P.3d 202 (2004) (quoting *State v. Jones*, 146 Wn.2d 328, 332, 45 P.3d 1062 (2002)). However, when determining whether a seizure had occurred under article I, section 7 of our State Constitution, Washington courts apply the test set forth in *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). *State v. Young*, 135 Wn.2d 498, 509-10, 957 P.2d 681 (1998); *see also Rankin*, 151 Wn.2d at 695; *State v. O'Neill*, 148 Wn.2d 564, 574, 62 P.3d 489 (2003).

Under the *Mendenhall* test for determining whether a seizure occurred, "'[N]ot every encounter between a police officer and a citizen is an intrusion requiring an objective justification.'" *Rankin*, 151 Wn.2d at 695 (quoting *Mendenhall*, 446 U.S. at 553). Rather, a seizure occurs under article 1, section 7 only when "considering all the circumstances, an individual's freedom of movement is restrained and the individual would not believe he or she is free to leave or decline a request due to an officer's use of force or display of authority." *Rankin*,

151 Wn.2d at 695. This determination is made objectively by looking at the officer's actions. *Rankin*, 151 Wn.2d at 695.

Police actions that may amount to a seizure include, "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Young*, 135 Wn.2d at 512 (quoting *Mendenhall*, 446 U.S. at 554-55). A criminal defendant "bears the burden to prove a seizure occurred in violation of [his or] her constitutional rights." *State v. Young*, 167 Wn. App. 922, 929, 275 P.3d 1150 (2012).

Although it is uncontested that neither of the responding officers "used or displayed any aggressive action or words towards [Louthan] during their contact," Louthan asserts that he was seized when the officers presented him with no other option than to accept the offer of a ride to Chehalis. CP at 21. We disagree. Even assuming that the officers' disapproval of Louthan's stated plans to knock on a person's door at 3:00 a.m. in the morning or to walk down the highway limited his options for leaving the area, a reasonable person in Louthan's situation would nonetheless feel free to decline the officer's offer of a ride or otherwise terminate the encounter.

The 'free to leave' test for determining when an individual is in custody is not automatically satisfied when a person is not physically able to leave an area in which he or she is contacted by police. *See, e.g.*, *Florida v. Bostick*, 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). Rather, the crucial test is whether a reasonable person would feel free to decline an officer's request or otherwise terminate the encounter. *Bostick*, 501 U.S. at 436; *State v. Kinzy*, 141 Wn.2d 373, 388, 5 P.3d 668 (2000). "Whether there was any show of authority on

the officer's part, and the extent of any such showing, are crucial factual questions in assessing whether a seizure occurred." *O'Neill*, 148 Wn.2d at 577. And "no seizure occurs where an officer approaches an individual in public and requests to talk to him or her, engages in conversation, or requests identification, so long as the person involved need not answer and may walk away." *State v. Cormier*, 100 Wn. App. 457, 461, 997 P.2d 950 (2000).

Here, after Deputy Heller's suspicions of criminal activity had been dispelled, he first attempted to assist Louthan by calling a number for Louthan's friend. After that attempt was unsuccessful, Heller asked Louthan what his plan was and whether he needed medical assistance due to his diabetes and lack of food. Louthan responded that he was "fine right now," but further stated, "I can't stand out here in the cold, I'm freezing man." Ex. 1, at 7 min., 43 sec. through 7 min., 47 sec. After Heller stated his disapproval of Louthan's plan to either knock on his friend's relative's door to use the phone or to walk down the highway, Heller presented Louthan with the offer of a ride to Chehalis on the condition that Heller first check that Louthan had no drugs or weapons on him. Louthan agreed to the offer but then asked whether someone else could provide him a ride. Heller asked Louthan if there was someone else who could provide him a ride, but Louthan did not provide any names. Heller again offered Louthan a ride to Chehalis and Louthan again agreed.

The police conduct under these circumstances, when viewed objectively, would not lead a reasonable person to believe that they could not terminate this encounter. Heller and Torson did not display any aggressive action toward Louthan during the interaction. And notably, Heller's offer to Louthan of a ride to Chehalis was neither a command nor a request. Instead, it was merely a proposal to which any reasonable person in Louthan's position could freely

11

decline. Because a reasonable person would feel free to terminate the police encounter and decline Heller's conditional offer of a ride, Louthan's challenge to finding of fact 1.7 fails.

B.  *Finding of Fact 1.27*[2]

Finding of Fact 1.27 states, "Louthan consented to the search of his person before entering the vehicle." CP at 22. Substantial evidence supports this finding.

"Whether consent was voluntary or instead the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *O'Neill*, 148 Wn.2d at 588. Factors that may be relevant to a finding of voluntariness are (1) whether police provided *Miranda*[3] warnings before obtaining consent, (2) the degree of education and intelligence of the consenting person, and (3) whether the police advised the consenting person of his or her right to refuse consent. *State v. Reichenbach*, 153 Wn.2d 126, 132, 101 P.3d 80 (2004). These factors, however, are not helpful here. First, no *Miranda* warnings were given, but none were required. Second, the record does not disclose Louthan's level of intelligence or degree of education. Finally where, as here, a subject is not in custody, knowledge of the right to refuse consent is not a prerequisite to finding that the subject's consent was voluntarily given. *O'Neill*, 148 Wn.2d at 588.

Other factors that may be relevant to a voluntariness finding are (1) whether the consenting person was restrained, (2) whether police had to repeatedly request consent before it

---

[2] Louthan does not discuss his consent to search or the voluntariness of such consent. Instead, he appears to argue that the search was the product of an illegal seizure, which argument we reject above. Because no seizure occurred prior to Louthan's arrest, we do not discuss the community caretaking exception to the warrant requirement.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

was given, and (3) whether the consenting person was cooperative or had refused consent before providing consent. *State v. Dancer*, 174 Wn. App. 666, 676, 300 P.3d 475 (2013). Here, Louthan was not restrained when he twice responded affirmatively to Heller's offer of a ride to Chehalis on the condition that Heller first check that he did not possess any drugs or weapons. As noted above, it is uncontested that neither of the responding officers acted aggressively in their interactions with Louthan. And there is nothing in the record suggesting that Louthan's consent was the product of coercion or duress. Accordingly, substantial evidence supports the trial court's finding that, under a totality of the circumstances, Louthan had voluntarily consented to a search of his person for drugs or weapons.

### III. SUPPRESSION RULING

Having determined that substantial evidence supports the trial court's challenged findings of fact, we turn to whether the findings support the challenged conclusions of law. Louthan assigns error to the trial court's conclusions of law 2.1, 2.2, and 2.3.

Conclusion of law 2.1 states, "Under the totality of the circumstances, Dep. Heller's actions with Louthan were a reasonable application of the community caretaking function of law enforcement up to the point Louthan consented to be searched." CP at 23. Regarding this conclusion, Louthan argues that his seizure was not justified under the officers' community caretaking function because he had declined the officer's offer to summon aid and because he did not otherwise exhibit any signs of physical distress requiring emergency treatment. But, having determined above that Louthan has not met his burden of showing he was seized prior to his arrest, we need not address Louthan's argument regarding the reasonableness of the officers' conduct under their community caretaking function.

13

Next, conclusion of law 2.2 states, "The consent given by Louthan as a condition of getting a ride was valid." CP at 23. Although Louthan assigns error to this conclusion of law, he does not address it in his brief. To the extent that Louthan is challenging the voluntariness of his consent to search his person, we have addressed the challenge in our review of the trial court's finding of fact 1.27 and held that substantial evidence supports the finding. Accordingly, we do not further address the issue.

Finally, conclusion of law 2.3 states, "Dep. Heller was allowed to require Louthan to be searched as a condition of giving him a ride in his patrol vehicle." CP at 23. Regarding this conclusion, Louthan argues only that Heller's search of his pockets went beyond the permissible scope of a protective weapons frisk. This argument ignores that Louthan had consented to Heller searching him for weapons or drugs as a condition of receiving a ride to Chehalis in Heller's patrol vehicle. Accordingly, Louthan's reliance on cases discussing the permissible "scope of a protective weapons search" in the context of an investigative *Terry*[4] stop or medical emergency are unavailing. Br. of Appellant at 14 (citing *State v. Wheeler*, 108 Wn.2d 230, 737 P.2d 1005 (1987); *State v. Loewen*, 97 Wn.2d 562, 647 P.2d 489 (1982)).

Because Louthan has not met his burden of proving that officers had seized him prior to his arrest and because substantial evidence supports the trial court's finding that he voluntarily consented to Heller's search for weapons and drugs as a condition of receiving a ride to Chehalis, we affirm the trial court's order denying Louthan's motion to suppress.

---

[4] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct 1868, 20 L. Ed. 2d 889 (1968).

No. 50674-2-II

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_____
Worswick, P.J.

We concur:

_____
Johanson, J.

_____
Melnick, J.