FILED
COURT OF APPEALS
DIVISION II

2013 APR 23 PM 12: 00

STATE OF WASHINGTON
BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42057-1-II |
| Respondent, | |
| v. | PART PUBLISHED OPINION |
| SANTONIO BONDS, | |
| Appellant. | |

BRIDGEWATER, J.P.T.[1] — Santonio Bonds appeals from his conviction for felony violation of a no-contact order. We hold that law enforcement officers performed a lawful warrantless traffic stop of a car in which Bonds was a passenger, based on their reasonable suspicion that the car's registered owner had committed the offense of failure to transfer title and their reasonable suspicion that Bonds was the car's passenger and that he had an active arrest warrant. Thus, the traffic stop was not pretextual. We further hold that Bonds failed to preserve for review the argument that his pockets were unlawfully searched contemporaneously and incident to his arrest, that sufficient evidence supports his conviction and that Bonds fails to demonstrate ineffective assistance of counsel. Therefore, we affirm his conviction.

## FACTS

After Bonds's arrest by law enforcement officers after a traffic stop, the State charged him with a felony violation of a no-contact order. Before trial, Bonds moved to suppress

---

[1] Judge C. C. Bridgewater is serving as a judge pro tempore of the Court of Appeals, Division II, pursuant to CAR 21(c).

evidence of his identification obtained by the officers after the traffic stop, arguing that they had no reasonable basis for suspecting that a failure to transfer title offense had occurred or that Bonds was the car's passenger, and they stopped the car for pretextual reasons.

At the suppression hearing, Tacoma Police Department Officer Timothy Caber testified that on July 31, 2009, he was on patrol with Officer Randy Frisbie. A random license plate records check Caber ran on a car returned results with a "vehicle sold tag"; such a tag indicated that title to the vehicle had been sold and the new owner had failed to title the car in his own name within 45 days, a misdemeanor offense. Report of Proceedings (RP) at 16-17.

At the same time Caber ran the records check, Frisbie "believed" he recognized the car's passenger as Bonds. RP at 18. Both officers worked on a daily basis with a Department of Corrections (DOC) officer who sometimes gave them a warrant list; based on this, both Caber and Frisbie believed Bonds had an active warrant for his arrest. Although Frisbie "wasn't a hundred percent certain" that Bonds was the vehicle's passenger, he "believed it enough that [he] would have stopped the car." RP at 29.

Based on the "vehicle sold" records check result and their belief that Bonds was the passenger and had a warrant for his arrest, the officers stopped the car. RP at 25-26. Caber approached the passenger's side of the car; when the passenger looked up, Caber recognized him as Bonds from a photograph Caber had previously seen. Caber asked Bonds to produce a form of identification "to basically just confirm [his] suspicions that [Bonds] was the . . . passenger." RP at 19-20.

After Bonds said he had no identification with him, Caber asked him to step out of the car; when Bonds did so, Caber placed him in "wrist restraints" and arrested him because he

believed Bonds was lying about not possessing any identification. RP at 29, 176-77. After searching Bonds, Caber discovered identification confirming his identity "[i]n one of his pockets." RP at 21.

While Caber contacted Bonds, Frisbie contacted the car's driver; at some point, the officers identified her as Surina Crumble. After Caber detained Bonds, Frisbie spoke with "Records" on his radio and learned that the car's new owner had properly transferred its title. RP at 21. Caber then checked Bonds's records, confirmed that he had an active DOC arrest warrant, and discovered that a no-contact order prohibited Bonds from having contact with Crumble. The officers subsequently transferred Bonds to jail.

The trial court denied Bonds's motion to suppress evidence. It entered the following relevant findings of fact:

I.

That on July 31, 2009, Tacoma Police [O]fficers Frisbie and Caber were working in there [sic] official capacity. Officer Frisbie was driving and Officer Caber was in the passenger seat operating a laptop computer.

II.

That on July 31, 2009, in the early afternoon a vehicle passed by Officers Frisbie and Caber. Officer Caber ran the license plate and learned that the vehicle had been sold over a year ago and the title had not been transferred within 45 days as required. At the same time, Officer Frisbie observed the defendant in the passenger seat of the car.

III.

That Officer Frisbie was not 100 percent sure it was the defendant but reasonably believed it was the defendant in the vehicle. Officer Frisbie and Caber knew the defendant from previous contacts and knew he had a felony DOC warrant at the time.

IV.

That Officers Frisbie and Caber turned there [sic] vehicle around and contacted the vehicle for the failure to transfer violation and because the defendant had a warrant for his arrest.

V.

That the vehicle stopped and Officer Frisbie contacted the driver and Officer Caber contacted the defendant. Officer Caber recognized the defendant on site [sic] because of the prior contacts and knew he was Santorio Bonds.

VI.

That Officer Caber asked the defendant for identification. The defendant said he did not have identification. At the time of this question and answer, the defendant was still seated in the vehicle and was not handcuffed.

VII.

That after the conversation about identification, Officer Caber detained the defendant in handcuffs. Officer Caber then confirmed that the defendant had a DOC warrant for his arrest[.] Officer Caber would also learn from a records check that the defendant was the respondent of a valid, served no contact order. The order prohibited contact with Surina Crumble.

VIII.

That at the same time Officer Caber was contacting the defendant[,] Officer Frisbie contacted the driver and identified her as Surina Crumble.

IX.

That a record check revealed that Surina Crumble's license to drive was suspended in the [third] degree.

X.

That Officer Caber would later contact Surina Crumble and recognized her from prior contacts with her. Officer Caber has had subsequent contacts with Surina Crumble and it was the same person as the driver.

XI.

That Surina Crumble was the protected party of the no contact order with the defendant.

XII.

That Officer Caber would later confirm that the failure to transfer title issue was a computer error from DOC and the vehicle was properly titled.

XIII.

That Officer Caber did not cite Surina Crumble with driving with a suspended license because she was the victim of a domestic violence no contact order.

XIV.

That Officer Caber identified Santorio Bonds as the defendant.

XV.

That the Court found the testimony of Caber credible.

Clerk's Papers (CP) at 132-35. The trial court entered the following relevant conclusions of law:

IV.

The Court finds that the [o]fficers had a reasonable, articulable basis to stop the vehicle. The officers had a reasonable belief the defendant was in the

vehicle and he had a warrant for his arrest. The officers also had a reasonable belief that the title to the vehicle had not been transferred and that was a crime. Either of these reasons provided a basis for the officers to stop the vehicle.

V.

The Court finds that the stop in this case was not a pretextual stop. The vehicle was stopped to deal with the title issue and the defendant's warrant. The officers had no other reason for stopping the car. [State v. ]Ladson[, 138 Wn.2d 343, 979 P.2d 833 (1999)] does not apply to the case. The stop was lawful.

CP at 136-37.

At trial, Frisbie testified about the traffic stop. According to Frisbie, when he contacted the car's driver and informed her of the failure to transfer title issue, she produced a Washington State identification card belonging to Crumble; Frisbie confirmed that the car's driver was the same person pictured on the identification card. The driver also said that the car belonged to her father; a check of the car's registration showed that it was registered to a person named Howard Crumble. Finally, Frisbie stated he had contact with Surina Crumble twice after Bonds's arrest, and she was the same person driving the vehicle on the day of the stop.

According to Caber, after the records check revealed the no-contact order, he contacted the car's driver. He was familiar with Crumble before the stop and, when he saw the driver, knew that she was Crumble.

The State also showed Crumble's driver's license to Caber and Frisbie during trial. Caber testified that the person in the license's photograph was Crumble. Frisbie testified that the license's photograph matched the photograph on the identification card produced by the car's driver during the traffic stop and that the same person depicted in both photographs had been driving the car.

Finally, the trial court admitted the no-contact order prohibiting Bonds from having contact with Crumble. The order was effective for five years from April 14, 2006, and Bonds had signed to indicate he had received copies of it.

Bonds stipulated that he had two prior convictions for violation of no-contact orders. He also testified that he knew about the no-contact order and had signed it but that Crumble was not the car's driver. Instead, before the traffic stop, he had been at an apartment with Tanya Tucker and Cozetta Booth. After Crumble called and asked if someone could pick up her daughter, Tucker allowed Booth and Bonds to borrow a car that Bonds believed belonged to Tucker. Booth drove. When shown Crumble's license at trial, Bonds admitted that the person in its photograph was Crumble.

The jury convicted Bonds as charged.

## ANALYSIS

### I. SUPPRESSION MOTION

Bonds argues that the trial court erred in denying his motion to suppress evidence because the evidence produced at the suppression hearing did not support its findings, Caber and Frisbie had no basis justifying the warrantless traffic stop, and the officers unlawfully stopped the car for pretextual reasons. Also, for the first time on appeal, Bonds contends that Caber unlawfully searched his pocket incident to his arrest. We disagree.

A.    Findings of Fact

When reviewing a trial court's denial of a suppression motion, we review its findings of fact for whether substantial evidence supports them and whether its findings support its conclusions of law. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "Substantial

evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). Unchallenged findings of fact are verities on appeal. *Hill*, 123 Wn.2d at 644.

Bonds assigns error to the trial court's findings 2, 3, 4, and 5. Thus, all other findings are verities on appeal. *Hill*, 123 Wn.2d at 644.

Bonds argues that substantial evidence does not support finding 2's statement that "[a]t the same time [that Caber discovered the failure to title issue with Crumble's car], Officer Frisbie observed the defendant in the passenger seat of the car" because, at that time, Frisbie only believed Bonds was the passenger. CP at 132; Br. of Appellant at 15-16. But Bonds's argument consists of pure semantics. Finding 2 did not state that Frisbie *knew* at that time that Bonds was the car's passenger; instead, finding 3 addressed Frisbie's level of certainty about the passenger's identity before the stop. Thus, finding 2 merely stated that the passenger Frisbie saw was Bonds, a fact supported by Caber's undisputed suppression hearing testimony. Substantial evidence supports finding 2.

Bonds next argues that substantial evidence does not support finding 3's statement that "'Officer Frisbie and Caber knew the defendant from previous contacts and knew he had a felony DOC warrant at the time.'" Br. of Appellant at 16-17 (quoting CP at 16-17). He also contests finding 5's statement that "'Officer Caber recognized the defendant on site [sic] because of the prior contacts and knew he was Santorio Bonds.'" Br. of Appellant at 18 (quoting CP at 133). But substantial evidence supports that the officers knew Bonds from prior contacts. Both findings 3 and 5 use the phrases "previous" or "prior" "contacts." Neither finding specifies that these past contacts were with Bonds. Both officers knew of Bonds through the DOC officer with

7

whom they worked on a daily basis, and Caber also knew his appearance through a photograph Caber had previously seen, presumably through the warrant list the DOC officer provided. Thus, the findings' use of "contacts" can be read to encompass either the officers' work with the DOC officer, the photograph Caber viewed, or both based on the testimony at the suppression hearing. Thus, substantial evidence would support that the officers knew Bonds through past "contacts" within that meaning.

Bonds further argues that substantial evidence does not support finding 4's statement that the officers "'contacted the vehicle . . . because the defendant had a warrant for his arrest.'" Br. of Appellant at 17 (quoting CP at 133). But Caber's testimony established that they believed Bonds was the car's passenger and they knew he had a warrant for his arrest. Substantial evidence supports finding 4.

B.  Conclusions of Law

Bonds challenges the trial court's conclusions of law 4 and 5 that the officers had a reasonable, articulable basis for stopping the car and that the stop was not pretextual. We disagree.

We review the trial court's conclusions of law de novo. *Garvin*, 166 Wn.2d at 249. Both the Fourth Amendment to the federal constitution and article I, section 7 of our state constitution prohibit warrantless searches unless one of the narrow exceptions to the warrant requirement applies. *Garvin*, 166 Wn.2d at 249-50. Article I, section 7 provides more extensive privacy protections than the Fourth Amendment and creates "'an almost absolute bar to warrantless arrests, searches, and seizures.'" *State v. Valdez*, 167 Wn.2d 761, 772, 224 P.3d 751 (2009)

(quoting *State v. Ringer*, 100 Wn.2d 686, 690, 674 P.2d 1240 (1983), *overruled in part by State v. Stroud*, 106 Wn.2d 144, 150-51, 710 P.2d 436 (1986)).

A traffic stop is a "seizure" under constitutional analysis. *State v. Ladson*, 138 Wn.2d 343, 350, 979 P.2d 833 (1999). But warrantless seizures are constitutional if they are reasonable under the Fourth Amendment and if they are undertaken with "authority of law" under article I, section 7 of the state constitution. *See State v. Williams*, 171 Wn.2d 474, 484-85, 251 P.3d 877 (2011). Thus, both constitutions permit a warrantless investigative detention—to which traffic stops are analogous—whenever a law enforcement officer has a reasonable suspicion, based on specific and articulable facts and rational inferences from those facts, that the stopped person has been or is about to be involved in a crime. *State v. Snapp*, 174 Wn.2d 177, 197-98, 275 P.3d 289 (2012) (applying state constitution); *State v. Acrey*, 148 Wn.2d 738, 747, 64 P.3d 594 (2003) (applying federal constitution); *Ladson*, 138 Wn.2d at 350 (traffic stops analogous to investigative detentions). In evaluating the reasonableness of an investigative detention, we consider "the totality of the circumstances, including the officer's training and experience, the location of the stop, and the conduct of the person detained." *Acrey*, 148 Wn.2d at 747 (footnote omitted). The State bears the burden of demonstrating that a warrantless search or seizure falls within an exception to the warrant requirement. *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996).

i. Failure to Transfer Title

Bonds argues that, because the officers could not arrest Crumble for failure to transfer the car's title, a completed misdemeanor offense, they similarly could not stop her car for the same offense. Because Bonds relies on outdated case law, we disagree.

No. 42057-1-II

The authority relied on by Bonds, *State v. Green*, 150 Wn.2d 740, 743-44, 82 P.3d 239 (2004), is inapplicable. On June 12, 2008, amendments to the failure to transfer title statute went into effect. LAWS OF 2008, ch. 316, § 1. The amended statute provided:

> Failure or neglect to make application to transfer the certificate of ownership and license registration within forty-five days after the date of delivery of the vehicle is a misdemeanor *and a continuing offense for each day during which the purchaser or transferee does not make application to transfer the certificate of ownership and license registration. Despite the continuing nature of this offense, it shall be considered a single offense, regardless of the number of days that have elapsed following the forty-five day time period.*

Former RCW 46.12.101(6) (2008) (emphasis added).

Thus, unlike in the earlier version of the statute relied on by the *Green* court, former RCW 46.12.101(6) contained language expressly stating that failure to transfer title is a continuing offense. And, because it was the statute in effect[2] during the 2009 traffic stop in this case, it applies to Bonds's case. Thus, because failure to transfer title was a continuing offense under that statute, it was a misdemeanor occurring in the officers' presence.

Accordingly, when Caber's license plate check of the car returned a "vehicle sold tag," he had specific and articulable facts that the registered owner had failed to transfer the car's title and, thus, a misdemeanor offense was being committed in Caber's presence. Therefore, Caber had lawful authority to stop the car and investigate whether the car's driver was also its registered owner. *See State v. Phillips*, 126 Wn. App. 584, 588, 109 P.3d 470 (2005) (law

---

[2] In 2010, the legislature recodified the statute governing transfers of vehicle titles as RCW 46.12.650. LAWS OF 2010, ch. 161, § 1211. RCW 46.12.650(7) currently provides: "The misdemeanor is a single continuing offense for each day that passes regardless of the number of days that have elapsed following the forty-five day time period."

10

enforcement officers with notice that a person's driver's license is suspended may stop any vehicle registered to that person and investigate whether the driver is the vehicle's registered owner). Caber's warrantless traffic stop of the car was justified because failure to transfer title is a continuing misdemeanor offense occurring in the officer's presence, and Bonds's claim fails.

ii. Bonds's Suspected Arrest Warrant

Bonds further contends that Frisbie's belief that Bonds was the car's passenger and had a warrant for his arrest did not justify the traffic stop because Frisbie's beliefs did not amount to the necessary reasonable suspicion. We disagree.

In the investigative detention context, a reasonable suspicion requires only sufficient probability, not absolute certainty. *New Jersey v. T.L.O.*, 469 U.S. 325, 346, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985). The trial court's findings demonstrate that, although Frisbie was not absolutely certain that Bonds was the car's passenger, he believed it enough to perform a traffic stop. And Frisbie's belief in Bonds's identity and both officers' belief that he had an outstanding warrant were based on information learned from the DOC officer with whom they daily worked. Thus, their beliefs were based on specific and articulable facts, not a mere hunch. Accordingly, the trial court's findings support its conclusion that reasonable suspicion that Bonds was the passenger and had an outstanding arrest warrant justified the investigative detention. Bonds's claim fails.[3]

---

[3] Bonds also cites *United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985), for the proposition that an investigative detention "to investigate a past crime, as distinguished from present or suspected future criminal activity, can *only* be made based on a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter is wanted in connection with a completed *felony*." Br. of Appellant at 14 (boldface omitted) (emphasis added). Bonds's citation is not well taken. The *Hensley* court did hold that the Fourth Amendment to the federal constitution permits investigative detentions to investigate a person's

11

### iii. Pretextual Stop

Bonds argues that the traffic stop was pretextual because its true purpose was to confirm his identity. But our Supreme Court has observed that the "essence" of every pretextual stop "is that the police are pulling over a citizen, not to enforce the traffic code, but to conduct a criminal investigation unrelated to the driving." *Ladson*, 138 Wn.2d at 349. "The question [is] whether the fact that someone has committed a traffic offense . . . justifies a warrantless seizure which would not otherwise be permitted absent that 'authority of law' represented by a warrant." *Ladson*, 138 Wn.2d at 352 (footnotes omitted). Here, the officers expressly stated that they had two, concurrent reasons for stopping the car: investigating the failure to transfer title offense and whether the car's passenger had an outstanding arrest warrant. As discussed above, both reasons were based on specific and articulable facts, were reasonable suspicions, and either justified the stop. Pretextual stop analysis is inapplicable here, and Bonds's claim fails.

---

connection with a completed felony. *Hensley*, 469 U.S. at 229. But the *Hensley* court also expressly stated, "We need not and do not decide . . . whether [investigative detentions] to investigate all past crimes, however serious, are permitted." *Hensley*, 469 U.S. at 229.

Bonds provides no further argument or citation to authority supporting his assertion that law enforcement officers may not perform an investigative detention to investigate a person's involvement with a completed, non-felony crime. We do not consider claims unsupported by argument or citation to legal authority. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Moreover, "[p]arties . . . raising constitutional issues must present considered arguments to this court." *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992). "'[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'" *Johnson*, 119 Wn.2d at 171 (quoting *In re Request of Rosier*, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986)). Because Bonds fails to provide citation to relevant authority and sufficient argument on this issue, he fails to demonstrate that the alleged error is truly of constitutional magnitude. Thus, we will not consider it for the first time on appeal. RAP 2.5(a)(3).

iv. Search Incident to Arrest

Finally, Bonds argues for the first time on appeal that Caber unlawfully searched him incident to arrest by searching his pocket. RAP 2.5(a) generally does not allow parties to raise claims for the first time on appeal. *State v. Robinson*, 171 Wn.2d 292, 304, 253 P.3d 84 (2011); *see also State v. Jones*, 163 Wn. App. 354, 365, 266 P.3d 886 (2011) (We do not generalize specific objections such that the existence of a pretrial motion to suppress evidence seized preserves *any* claim of error with respect to that evidence), *review denied*, 173 Wn.2d 1009 (2012). But RAP 2.5(a)(3) allows appellants to raise claims for the first time on appeal if such claims constitute manifest error affecting a constitutional right.

To determine whether an error is truly of constitutional dimension, appellate courts first look to the asserted claim and assess whether, if the claim is correct, it implicates a constitutional interest as compared to another form of trial error. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). Here, an unlawful warrantless search would have violated the Fourth Amendment's and article I, section 7's protections against warrantless searches. His alleged error is constitutional in nature.

Next, Bonds must demonstrate that the alleged error was manifest. To establish manifest error allowing appellate review, appellants must demonstrate actual prejudice resulting from the error, i.e., that the error had "'practical and identifiable consequences'" at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011) (internal quotation marks omitted) (quoting *O'Hara*, 167 Wn.2d at 99). An appellant demonstrates actual prejudice when he establishes from an adequate record that the trial court likely would have granted a suppression motion. *State v. Contreras*, 92 Wn. App. 307, 313-14, 966 P.2d 915 (1998).

We have specifically addressed the issue of pocket searches of an arrested person's clothing and found them to be lawful as a search incident to arrest. *State v. Jordan*, 92 Wn. App. 25, 31, 960 P.2d 949 (1998). We based this holding on *Chimel v. California*, 395 U.S. 752, 762-63, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), stating the underlying justifications for searches of an arrestee's person:

> The Fourth Amendment limits the permissible scope of a warrantless search incident to arrest to the area within the arrestee's immediate control, i.e., places from which the individual might obtain a weapon or destroy incriminating evidence.

*Jordan*, 92 Wn. App. at 29 (quoting *State v. Mitzlaff*, 80 Wn. App. 184, 186, 907 P.2d 328 (1995)) (citing *Chimel*, 395 U.S. at 763), *review denied*, 129 Wn.2d 1015 (1996). Thus, we held that the scope of a search incident to arrest clearly included Jordan's clothing and pockets because they were in his immediate control. *Jordan*, 92 Wn. App. at 29.

Our holding in *Jordan* is consistent with past and relatively recent cases decided after *Chimel*. In 1973, the United States Supreme Court again addressed searches of an arrestee's person. *United States v. Robinson*, 414 U.S. 218, 221-23, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973). *Robinson* approved a search by a law enforcement officer who searched the defendant incident to his arrest by patting him down, reaching into his coat pockets, and opening a cigarette pack discovered in one of those pockets; the cigarette pack contained heroin. *Robinson*, 414 U.S. at 221-24. The *Robinson* court observed that the authority to search an arrestee's person does not require a showing of some particular level of probability that weapons or evidence would be found on the person. *Robinson*, 414 U.S. at 235.

14

No. 42057-1-II

More recently, *Arizona v. Gant*, 556 U.S. 332, 340-43, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) and its progeny, are inapplicable here because they involved searches of the passenger compartments of cars, which may or may not be under an arrestee's control at the time of a search, depending on whether the arrestee is secured and removed from the car. Furthermore, in *Valdez*, 167 Wn.2d at 768-69, our Supreme Court discussed the Fourth Amendment and reaffirmed *Chimel*'s validity, observing that—under the twin *Chimel* justifications of "officer safety and the preservation of evidence of the crime prompting arrest"— "an officer may conduct a search incident to arrest of the arrestee's person and the area within his or her immediate control." When the *Valdez* court turned to article I, section 7, it observed that searches incident to arrest arose from and are permitted for the same justifications *Valdez*, 167 Wn.2d at 773, 777.

Unlike searches of vehicles incident to arrest, the arrestee's person, including the clothing he is wearing at the time of the search, is always under his immediate control, giving rise to a concern that he may access a weapon or destroy evidence concealed on his person. *See United States v. Chadwick*, 433 U.S. 1, 14-15, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977), *overruled on other grounds by California v. Acevedo*, 500 U.S. 565, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991). Handcuffing a defendant does not change this fact. As Division One of this court recently observed, "Cases exist where handcuffed individuals have acted extraordinarily, threatening officers and public safety." *State v. MacDicken*, 171 Wn. App. 169, 175, 286 P.3d 413 (2012).

> "'Albeit difficult, it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself. Finally, like any mechanical device, handcuffs can and do fail on occasion.'"

15

*MacDicken*, 171 Wn. App. at 417 n.17 (internal quotation marks omitted) (quoting *United States v. Shakir*, 616 F.3d 315, 321 (3rd Cir.), *cert. denied*, ___ U.S. ___, 131 S. Ct. 841, 178 L. Ed. 2d 571 (2010)). Thus, our holding in *Jordan* that law enforcement officers may perform warrantless searches of an arrestee's person, including his clothing, is still valid under the federal and state constitutions.

Here, Caber searched Bonds's pockets incident to his arrest, which was a lawful warrantless search of Bonds's person. *Accord Jordan*, 92 Wn. App. at 29. Thus, Bonds fails to demonstrate manifest error and accordingly this issue is not preserved for our review.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

## II. SUFFICIENCY OF THE EVIDENCE

Bonds argues that because the trial court should have suppressed evidence obtained subsequent to the traffic stop and his search incident to arrest, sufficient evidence does not support his conviction for felony violation of a no-contact order.

Sufficient evidence supports a conviction if, when viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime proved beyond a reasonable doubt. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). On appeal, we draw all reasonable inferences from the evidence in the State's favor and interpret them most strongly against the defendant. *Hosier*, 157 Wn.2d at 8. In the sufficiency context, we consider circumstantial evidence as probative as direct evidence. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). We may infer specific criminal intent of the accused from

16

conduct that plainly indicates such intent as a matter of logical probability. *Goodman*, 150 Wn.2d at 781. We defer to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970, *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

To convict Bonds of felony violation of a no-contact order, the State had to prove: (1) on July 31, a no-contact order applicable to Bonds existed; (2) Bonds knew of the order's existence; (3) on July 31, Bonds violated a provision of the order; (4) Bonds had twice been previously convicted of violating provisions of a court order; and (5) Bonds's act occurred in Washington state. As discussed above, the trial court did not err in denying Bonds's motion to suppress evidence. The State admitted a court order applying to Bonds on July 31, 2009, and prohibiting him from having contact with Crumble. Bonds testified that his signature was on the order and he knew of its existence. Caber and Frisbie, both familiar with Crumble from contacts with her before or after the stop, identified her as the car's driver. And Bonds stipulated at trial to two previous convictions for violating no-contact orders. Sufficient evidence supports his conviction, and his claim fails.

### III. STATEMENT OF ADDITIONAL GROUNDS (SAG)

In his SAG, Bonds argues that defense counsel was ineffective for failing to file a witness list or subpoenas to secure the testimony of Booth, Tucker, and his community corrections officer, Russell Alfaro, in his defense at trial.

The record provides that, as part of Alfaro's investigation of Bonds's sentence violations following the traffic stop and his arrest, Alfaro received sworn and notarized statements from

Crumble and Tucker and a statement allegedly from Booth. According to Alfaro's report, the statements provided that Booth, not Crumble, drove the car on July 31, and Booth falsely claimed she was Crumble during the traffic stop because she thought Crumble had a valid driver's license. Defense counsel demonstrated before and during trial that he was aware of Booth, Tucker, and the contents of their statements to Alfaro. He informed the trial court that, despite his efforts, he was unable to locate or contact Booth. Although he had located Tucker and contacted her, he was unable to serve her with a subpoena; every time service was attempted at her apartment, no one answered the door. Defense counsel continued contacting Tucker until the last day of trial in attempts to secure her presence as a witness, to no avail. And the trial court ultimately ruled that Alfaro's anticipated testimony was inadmissible because it was irrelevant and double hearsay.

We review claims of ineffective assistance of counsel de novo. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). To prevail on an ineffective assistance of counsel claim, the defendant must show that defense counsel's objectively deficient performance prejudiced him. *McFarland*, 127 Wn.2d at 334-35. We strongly presume that counsel is effective and the defendant must show no legitimate strategic or tactical reason supporting defense counsel's actions. *McFarland*, 127 Wn.2d at 336.

To demonstrate prejudice, the defendant must show that a reasonable probability exists, absent trial counsel's inadequate performance, the proceeding would have resulted in a different outcome. *McFarland*, 127 Wn.2d at 335. A failure to demonstrate either deficient performance or prejudice defeats an ineffective assistance claim. *See McFarland*, 127 Wn.2d at 334-35; *see also Strickland v. Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

18

First, defense counsel stated that he made unsuccessful efforts to locate and contact Booth. The limited record before us does not indicate that those efforts were objectively deficient. Moreover, Bonds fails to demonstrate what Booth would have testified to at trial. Alfaro never personally spoke with her or directly received a written statement from her. Thus, he also fails to demonstrate prejudice.

Second, the record reflects defense counsel's repeated attempts to serve Tucker with a subpoena and, through the last day of trial, his attempts to secure her presence as a witness. The record does not reflect objectively deficient performance.

Finally, the trial court ruled that Alfaro's anticipated testimony was inadmissible because it was irrelevant and hearsay. Bonds did not challenge those rulings below. Accordingly, because Alfaro's testimony was inadmissible, he fails to demonstrate prejudice. His claims fail.

We affirm.

Bridgewater, JPT

We concur:

Hunt, J.

Johanson, A.C.J.

19