IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85675-8-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| NATHANIEL GILBERT CRAVEN, | |
| Appellant. | |

SMITH, J. — In April 2012, law enforcement pulled Nathaniel Craven over for erratic driving. Craven declined to submit to a field sobriety test. Noting the smell of alcohol in the vehicle, on Craven's person, and his slow and clumsy language, an officer arrested him for driving under the influence (DUI).

The State charged Craven with felony DUI, violation of ignition interlock, and reckless driving. Craven pleaded guilty to the second charge and a jury convicted him as to the other two. The court imposed a standard range, an additional six months of electronic home detention, and various financial obligations. Craven also lost his right to possess a firearm.

Craven appeals, asserting that the trial court violated his Fourth and Fifth Amendment rights in admitting into evidence his refusal to perform a field sobriety test, the trial court violated his second amendment right in prohibiting him from possessing firearms following his felony conviction, and that various legal financial obligations (LFOs) should be stricken. We affirm Craven's

convictions but remand for the trial court to strike the emergency response fee, Title 46 fee, and toxicology lab fee.

FACTS

In April 2021, Auburn Police Officer Bryce Barager pulled Nathaniel Craven over for driving erratically on State Route 167. Craven had been repeatedly drifting outside of his lane and appeared to have difficulty maintaining a consistent speed. He was not driving above the speed limit.

Craven was "slow to acknowledge" Officer Barager, who "had to chirp [his] siren" to get Craven to stop. Craven eventually exited the highway and pulled over onto the shoulder of an exit ramp. Officer Barager had his service weapon in hand as he approached the vehicle, but did not believe Craven saw it. Craven did not initially respond when Officer Barager approached his vehicle and he had to knock multiple times on the vehicle's window before Craven reacted. Once Craven lowered his window, Officer Barager observed that his movements were "clumsy and sluggish." Officer Barager could also smell alcohol. When asked about his erratic driving, Craven apologized and stated he had been distracted by calls from his wife. Officer Barager noticed that his speech was "very slurred." Craven categorically denied drinking. He did acknowledge, however, that he did not have an ignition interlock installed in his car as required by a prior conviction.

Officers Derek Pederson and Robert Swales joined Officer Barager shortly after he pulled Craven over. Officer Barager noted to the other officers that Craven appeared to be "an imminent danger to the public driving the way that he was." Officer Barager then asked if Craven would be willing to perform field

2

sobriety tests. Craven refused. Craven then became argumentative, questioning the validity of the traffic stop. Concluding that Craven was under the influence of alcohol, Officer Barager ordered him out of his vehicle and placed him under arrest for DUI.

When asked if he had a weapon on him, Craven informed the officers that he carried a gun. The officers seized the gun without incident.

Once at the police station, Craven was asked if he would like to submit to a breath-alcohol test. After being read implied consent warnings, Craven refused to provide a breath sample. Officers warned him that this would result in a suspended license. Law enforcement did not seek a warrant to authorize a blood draw.

Having determined that Craven had been convicted of three or more prior DUI offenses in the last 10 years, the State charged Craven with felony DUI, violation of an ignition interlock, and reckless driving. Craven pleaded guilty to the ignition interlock charge but proceeded to trial on the other two. Before trial, he unsuccessfully moved to exclude his refusal to perform field sobriety tests as substantive evidence. The jury convicted Craven as charged.

The court sentenced Craven to confinement within the standard range, which he had already satisfied at sentencing, and an additional six months of electronic home detention. As a result of his felony conviction, he lost his right to carry a firearm. Craven's sentence also barred him from possessing firearms and ammunition as a condition of community custody. The court denied

Craven's request to return his seized weapon to his attorneys for safekeeping.

The judgment also included various LFOs totaling $1,186.27.

Craven appeals.

ANALYSIS

Right to Silence and Privacy

Craven asserts that the trial court violated his constitutional rights to silence and privacy in admitting his refusal to perform a field sobriety test (FST) as substantive evidence of guilt. But because Craven was not under arrest when Officer Barager asked him to perform the FSTs, the request was not an unreasonable search or seizure and the court properly admitted his refusal at trial.

1. Right to Privacy

Craven argues that the trial court violated his Fourth Amendment and article I, section 7 protections against unreasonable search and seizure in commenting on his refusal to perform FSTs. Because Officer Barager's request did not violate his right to privacy, the trial court properly admitted the evidence at trial.

We review whether the facts presented constitute an unreasonable search or seizure de novo. *State v. Rankin*, 151 Wn.2d 689, 694, 92 P.3d 202 (2004).

The Fourth Amendment of the United States Constitution and article I, section 7 of the Washington State Constitution protect an individual's right to privacy – prohibiting unreasonable search or seizure. U.S. CONST. amend. IV; CONST. art. I, §7. The State may violate this right by eliciting testimony

4

commenting on the defendant's exercise of their right to privacy. *State v. Gauthier*, 174 Wn. App. 257, 265, 298 P.3d 126 (2013). A jury may not infer guilt from a refusal to allow an unreasonable search or seizure. *Gauthier,* 174 Wn. App. at 265.

Article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Without a warrant or exception to the warrant requirement providing that authority of law, a search or invasion is unlawful. *State v. Villela*, 194 Wn.2d 451, 458, 450 P.3d 170 (2019). Investigatory detentions, known as *Terry*[1] stops, are one such exception to the warrant requirement. *State v. Baro*, 55 Wn. App. 443, 445, 777 P.2d 1086 (1989).

Under *Terry*, an individual may be lawfully seized, without a warrant, when law enforcement "has a reasonable suspicion, based on specific and articulable facts and rational inferences from those facts, that the stopped person has been . . . involved in a crime." *State v. Bonds*, 174 Wn. App. 553, 564-65, 299 P.3d 663 (2013). The stop must be " 'reasonably related in scope to the justification for [its] initiation.' " *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (internal quotation marks omitted) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S. Ct. 2574 , 45 L. Ed. 2d 607 (1975)).

*State v. Mecham*, 186 Wn.2d 128, 380 P.3d 414 (2016), is the most recent Supreme Court authority on *Terry* stops and FSTs. As a non-majority opinion, the narrowest ground upon which a majority agrees governs. *In re Pers.*

---

[1]  *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

*Restraint of Francis*, 170 Wn.2d 517, 532 n.7, 242 P.3d 866 (2010). In *Mecham*, five justices held that "an FST is a seizure but not a search so long as the suspect has not already been arrested for an unrelated offense and the seizure is justified under *Terry*." 186 Wn.2d at 130.

### a. Justified Under Terry

Craven asserts that the stop was not justified under *Terry* and therefore constitutes an unconstitutional search or seizure. We disagree.

We review whether a seizure is justified under *Terry* de novo. *State v. Howerton*, 187 Wn. App. 357, 364, 348 P.3d 781 (2015). Again, law enforcement may lawfully seize an individual, without a warrant, if they have a reasonable suspicion based on articulate facts that the individual has been involved in a crime. *Bonds*, 174 Wn. App. at 564-65. A reasonable suspicion requires only sufficient probability, not absolute certainty. *Bonds*, 174 Wn. App. at 566.

Because Craven did not assign error to any of the court's factual findings, they are verities on appeal. *State v. Gasteazoro-Paniagua*, 173 Wn. App. 751, 755, 294 P.3d 857 (2013).

Here, Officer Barager's dashboard camera footage shows Craven weave across multiple lanes at varying speeds. Officer Barager also observed other vehicles adjusting their own positioning to avoid contact with Craven's vehicle. And when Officer Barager indicated to Craven to pull over, it took the emergency siren to get Craven to stop driving.

Craven's inability to stay in his lane, inconsistent speed, and slow reaction time provided Officer Barager with articulable facts to support a sufficient probability that Craven was involved in a crime. That sufficient probability then establishes the reasonable suspicion needed for a valid *Terry* stop.

Officer Barager's stop was justified under *Terry* and therefore not an unreasonable search or seizure.

### b. Custody

Craven next states that the *Terry* exception to the warrant requirement does not apply because Craven was essentially under arrest when Officer Barager requested the FSTs and Officer Barager intended to use the FSTs to gather evidence of Craven's guilt. We conclude that Craven was not under arrest.

We review whether an individual is in custody de novo. *State v. Escalante*, 195 Wn.2d 526, 531, 461 P.3d 1183 (2020).

Providing a warrant exception only during investigative detentions, *Terry* no longer provides an exception once an individual has been arrested. *Terry*, 392 U.S. at 7-8; *State v. O'Neill,* 148 Wn.2d 564, 589, 62 P.3d 489 (2003). In determining whether an individual is in custody, the court will consider "whether a reasonable person in the [defendant's] position would believe [they were] in police custody to a degree associated with formal arrest." *State v. Lorenz*, 152 Wn.2d 22, 36-37, 93 P.3d 133 (2004).

The tone of the interaction, straightforward and non-deceptive nature of law enforcement's questions, lack of physical restraint, and length of the

7

encounter all factor into whether a reasonable person would believe they were formally arrested. *State v. Persinger*, 72 Wn.2d 561, 562, 433 P.2d 867 (1967); *State v. Ferguson*, 76 Wn. App. 560, 567, 886 P.2d 1164 (1995); *Escalante*, 195 Wn.2d at 541; *State v. Radka*, 120 Wn. App. 43, 49-50, 83 P.3d 1038 (2004); *State v. Wheeler*, 108 Wn.2d 230, 237, 737 P.2d 1005 (1987).

Officer Barager was calm, casual and respectful in conversing with Craven. He did not initially accuse Craven of any wrongdoing, and when he eventually asked Craven questions about alcohol, they were brief and straightforward. Officer Barager did not physically restrain Craven, and Craven remained in his vehicle within full view of the highway. That Craven was neither removed from his vehicle nor handcuffed is a strong indication that he was not yet in custody. And as approximately 10 minutes passed between Officer Barager first approaching the vehicle and asking Craven to perform a FSTs, the short time frame indicates an investigatory detention rather than an arrest.

Craven points to the fact that Officer Barager drew his weapon when approaching the vehicle as evidence that he was under arrest. But the uncontested findings of fact indicate that Craven was likely unaware of Officer Barager's weapon. By the time Craven acknowledged Officer Barager, his weapon was put away. Further, Officer Barager's weapon was never pointed at Craven and was holstered for the entirety of their interaction.

A reasonable person in Craven's position would not feel restrained to the degree associated with formal arrest. Therefore, because Officer Barager's

8

request that Craven perform FSTs was part of a *Terry* seizure, the request does not constitute an unreasonable search or seizure.

2. Right to Silence

Craven also suggests that admitting his refusal to perform the FSTs violated his right to silence under the Fifth Amendment and article I, section 9. We again disagree.

The Washington Supreme Court has "repeatedly held that the performance of an FST is nontestimonial," and therefore, "Fifth Amendment protections do not apply." *City of Seattle v. Stalsbroten*, 138 Wn.2d 227, 232-33, 978 P.2d 1059 (1999). And Washington courts have repeatedly held that "[t]he protection provided by [article I, section 9] is coextensive with that provided by the Fifth Amendment." *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008); *State v. Earls*, 116 Wn.2d 364, 374, 805 P.2d 211 (1991); *State v. Terry*, 181 Wn. App. 880, 889, 328 P.3d 932 (2014).

Because Fifth Amendment and article I, section 9 protections do not apply to non-testimonial FSTs, the court did not violate Craven's right to silence in admitting his refusal at trial.

Right to Bear Arms

Craven next claims that the trial court violated his constitutional right to bear arms by barring him from possessing firearms based on his non-violent felony conviction. We conclude that the Washington statutes prohibiting felons from possessing firearms are constitutional.

9

We review the constitutionality of a statute de novo. *State v. Zigan*, 166 Wn. App. 597, 603, 270 P.3d 625 (2012). As statutes are presumed constitutional, the party challenging the constitutionally bears the burden of proving otherwise beyond a reasonable doubt. *State v. Batson*, 196 Wn.2d 670, 674, 478 P.3d 75 (2020); *Didlake v. State*, 186 Wn. App. 417, 422-23, 345 P.3d 43 (2015).

1. <u>Second Amendment Right to Bear Arms</u>

The Second Amendment provides, "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. CONT. amend. II. "[T]he right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.' " *United States v. Rahimi*, 602 U.S. 680, 690, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)). The Supreme Court has construed the amendment to guarantee an individual right to possess and carry weapons. *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). However, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626.

In *Heller*, the Supreme court notably clarified that the Second Amendment right to possess firearms belongs to "law-abiding, responsible citizens" and emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 635, 626. Such regulations, the court continued, are presumptively lawful.

10

*Heller*, 554 U.S. at 627.  The Supreme Court reaffirmed *Heller* in *McDonald*, 561 U.S. 742, again providing that *Heller* did not undermine long-standing regulatory measures such as " 'prohibitions on the possession of firearms by felons.' " *McDonald*, 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 627).

The Supreme Court revisited *Heller*, however, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022).  *New York State Rifle* clarified the appropriate Second Amendment analysis, stating

> [w]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.

142 U.S. at 17.

Therefore, courts must first determine whether the plain text covers the individual's conduct.  *New York State Rifle* at 142 U.S. at 17.  If so, the constitution presumptively protects the conduct and the government must march though the nation's historical tradition of firearm regulation to justify regulation. *New York State Rifle* at 142 U.S. at 17.  In making this determination, courts then consider whether the challenged regulation is "relevantly similar" in light of "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *New York State Rifle* at 142 U.S. at 29.  The government bears the burden of production and persuasion, but need only "identify a well-established

11

and representative historical *analogue*, not a historical *twin.*" *New York State Rifle* at 142 U.S. at 30.

Applying this framework, the *New York State Rifle* court held, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 142 U.S. at 10. Significantly, the court emphasized that it reaffirmed and clarified *Heller* and *McDonald,* rather than abrogating the Court's reasoning in those cases. *New York State Rifle* at 142 U.S. at 10. The court also emphasized that the right to bear arms is held by "law-abiding, responsible citizens." *New York State Rifle* at 142 U.S. at 70.

Recently, in *Rahimi*, the Supreme Court used the *New York State Rifle* test to reject a facial challenge to the constitutionality of a statute that prohibited an individual subject to a domestic violence restraining order from possessing a firearm. 602 U.S. at 701. In doing so, the court reiterated *Heller*'s statement that prohibitions on the possession of firearms by persons with felony convictions are presumptively lawful. *Rahimi*, 602 U.S. at 699.

RCW 9.41.040(1) provides that a person is guilty of the crime of unlawful possession of a firearm in the first degree if they own, access, or have custody, control, or possession over a firearm after having been convicted of a serious offense. RCW 9.41.010(42)(q) defines serious offense to include any felony charged under RCW 46.61.502(6), which involves three or more convictions for driving under the influence in the past 10 years. RCW 9.41.047 then clarifies that, at the time a person is convicted of an offense making the person ineligible

12

to possess a firearm under state law, the court shall notify that person that they may not possess a firearm unless the superior court that issued the order restores the person's firearm rights.

Craven, relying primarily on *New York State Rifle*, asserts that the State cannot meet its burden to prove disarming him based on his non-violent felony comports with this nation's historical tradition of regulating firearms. We disagree.

### a. Historical Analysis

In considering historical sources to interpret the Constitution, "not all history is created equal." *New York State Rifle*, 597 U.S. at 34. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634-35. Thus, neither historical precedent that pre-dates the amendment nor post-enactment history should carry too much weight. *New York State Rifle*, 597 U.S. at 34. However, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691-92. Accordingly, "a court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' " *Rahimi*, 600 U.S. at 692 (alteration in original) (quoting *New York State Rifle*, 597 U.S. at 29 n. 7). An appropriate analysis considers whether the "challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 600 U.S. at 692.

13

The first federal law prohibiting felons from possessing firearms passed in 1938 and applied only to those convicted of "a crime of violence." Federal Firearms Act, Pub. L. No. 75-785, § 2(e), 52 Stat. 1250, 1251 (1938) (repealed). Express disarmament expanded to cover all felons in 1961. *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, § 2, 75 Stat. 757, 757 (repealed).

However, early American laws regularly disarmed individuals for nonviolent acts. Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506 (2004). Additionally, common law displays a long history of disarming individuals who were viewed as a danger to the public order. *See United State v. Williams*, 113 F.4th 637 at 650-57 (6th Cir. 2024) (providing a detailed historical summary of common law and determining that "governments in England and colonial America long disarmed groups that they deemed to be dangerous."); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 272 (2020) (noting that "the historical justification for felon bans reveals one controlling principal that applies to each historical period: violent or otherwise dangerous persons could be disarmed"); R. Brian Tracz, Comment, Bruen *and the Gun Rights of Pretrial Defendants*, 172 U. PENN. L. REV. 1701, 1719 (2024) (providing a historical overview that demonstrates how "substantial burdens were placed on the rights of dangerous people to possess firearms before, at, and directly after the founding.").

And beyond the historical evidence of disarmament, at the time of the ratification of the Second Amendment, "[f]elonies were so connected with capital

14

punishment that it was 'hard to separate them.' " *Medina v. Whitaker*, 913 F.3d 152, 158 (2019) (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *98 . In fact, felony cases punishable by death included "nonviolent offenses that we would recognize as felonies today." *Medina*, 913 F.3d at 158. And early legislatures "authorized punishments that subsumed disarmament – death or forfeiture of a perpetrator's entire estate – for non-violent offenses." *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024). "[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.

Because the statutes restrict firearm rights, the plain text of the Second Amendment addresses the conduct at issue. Therefore, we next consider whether the nation's historic tradition of firearm regulation justifies this particular regulation.

Beginning with the early federal laws explicitly prohibiting felons from possessing firearms, Craven does not challenge the disarmament of violent felons. In fact, Craven repeatedly draws a distinction between violent and nonviolent felons, likely because of the extent of the case law upholding the disarmament of violent felons. After having drawn that distinction, Craven then emphasizes the time gap between the ratification of the Second Amendment and any federal law disarming nonviolent felons.

But the difference between 1791 and 1935 and 1791 and 1961 is not a dramatic one. A less than 30-year difference in a 150-year gap is not enough to suggest that the prohibition on non-violent offenders is no longer consistent with

15

the founder's intentions, especially because disarmament of violent offenders has been repeatedly affirmed.

Next, the extent of contemporaneous common law indicates that the modern practice of felon disarmament, violent or nonviolent, is consistent with the principles that underpin our regulatory tradition. Craven committed a felony offense by repeatedly driving while intoxicated. Such behavior poses a danger to the public order. As a result, disarmament is an appropriate response, both at ratification and now.

### b. Recent Case Law

Beyond the historical analysis indicating that disarmament of nonviolent offenders is consistent with our nation's tradition of regulating firearms, recent case law continues to affirm such disarmament.

*State v. Ross*, 28 Wn. App. 2d 644, 649, 537 P.3d 1114 (2023), *review denied*, 2 Wn.3d 1026 (2024), provides that "[New York State Rifle] did not overrule, or cast doubt on, the Court's recognition in *Heller* and *McDonald* that the Second Amendment did not preclude prohibitions on felons possessing firearms."

*State v. Bonaparte*, 32 Wn. App. 2d 266, 278, 554 P.3d 1245 (2024) *review denied*, 4 Wn.3d 1019 (2025), then notes the inability to explain away "the United States Supreme Court's repeated articulation that prohibitions on the possession of firearms by felons are presumptively lawful." *Bonaparte* further clarifies that " '[n]either [*New York State Rifle*] nor *Heller* frame[s] the analysis in

16

terms of violent versus nonviolent felons.' " 32 Wn. App. 2d at 279 (some alterations in original) (quoting *Ross*, 28 Wn. App. at 651).

Craven first contends that *Ross* was wrongly decided because the court "reasoned Ross did not have Second Amendment rights because he was not a law-abiding citizen," a type of reasoning rejected by the Supreme Court in *Rahimi*. But the Supreme Court in *Rahimi* rejected the idea that an individual may be disarmed "simply because he is not 'responsible.' " 602 U.S. at 701. The court did not address the "law-abiding" language used in *Heller*, *McDonald*, and *New York State Rifle*. In fact, the court in *New York State Rifle*, after having considered the historical analysis from "antebellum America," determined that none of the limitations on the right to bear arms at issue operated to prevent "*law-abiding* citizens" from carrying arms in public. 597 U.S. at 5. Additionally, *Rahimi* reaffirmed *Heller*'s more general pronouncement that prohibitions "on the possession of firearms by 'felons' " were " 'presumptively lawful.' " 602 U.S. at 682 (quoting *Heller*, 554 U.S. at 626).

Regardless of any determination of responsibility, or lack thereof, Craven is clearly not a law-abiding citizen. And because *Rahimi* does not reject the "law-abiding" language, *Ross* is applicable law.

Craven then attempts to distinguish *Ross* and *Bonaparte* based on the fact that the cases deal with violent felonies. But again, both cases specifically note the lack of distinction between violent and non-violent felonies. Indeed, *State v. Olson*, in affirming the restriction of firearm rights for non-violent felonies, specifically notes that *Bonaparte* points out how other courts have " 'upheld

17

prohibitions on the possession of firearms by nonviolent felons.' " 33 Wn. App. 2d 667, 565 P.3d 128 (2025) (quoting *Bonaparte*, 32 Wn. App. 2d at 277-79).

Most recently, this court determined in *State v. Hamilton*, 33 Wn. App.2d 859, 565 P.3d 595 (2025), that *New York State Rifle* required new analysis for the question of whether Washington statutes restricting firearm rights are unconstitutional as applied to a specific offender. In performing that analysis, this court determined that the restrictions were not unconstitutional as applied to Hamilton. Now, using *Ross* and *Bonaparte* to inform our analysis, we conclude that the Washington statutes are not unconstitutional as applied to Craven either.

In *Hamilton*, the court clarified that an offender may constitutionally lose firearm rights if the enacted felony places the offender "squarely in the category of persons deemed dangerous to the public order for the purpose of historical firearms regulation." 33 Wn. App. 2d at 874.

Here, Craven's repeated infractions for driving while intoxicated and the intersection of alcohol misuse and gun violence indicate that he fits the category of person deemed dangerous for the purpose of historical firearm regulation. And although Craven's felony offense did not result in the death of another person, as Hamilton's did, *Ross* and *Bonaparte* indicate that the distinction between violent and nonviolent felonies is inconsequential for this particular analysis.

Because disarmament of nonviolent felons is consistent with this nation's historical tradition of firearm regulation and Craven fits the category of person

deemed dangerous for the purpose of historical firearm regulation, the statutes at issue do not violate Craven's Second Amendment right to bear arms.

2. Article I, Section 24

Craven also asserts that the laws disarming him independently violate Washington's constitutional provision protecting firearm rights. Because Craven cannot establish that the statutes are not reasonably necessary to protect public safety and substantially related to the legitimate ends sought, the statutes at issue do not violate article I, section 24 of the Washington State Constitution.

The Washington State Constitution provides an independent protection of the right to bear arms, stating that such a right "shall not be impaired." WASH. CONST. art. I, § 24; *State v. Rupe*, 101 Wn.2d 664, 706, 683 P.2d 571 (1984) (plurality opinion). Although interpreted independently from the Second Amendment, article I, section 24 similarly provides that the right to bear arms is a fundamental right. *Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 780, 819 P.2d 370 (1991).

The Washington Supreme Court last considered firearm rights and protections in *State v. Sieyes*, 168 Wn.2d 276, 225 P.3d 995 (2010), and *State v. Jorgenson*, 179 Wn.2d 145, 312 P.3d 960 (2013).

In *Sieyes*, addressing the constitutionality of a statute prohibiting juvenile handgun possession, the court "look[ed] to the Second Amendment's original meaning, the traditional understanding of the right, and the burden imposed on children by upholding the statute." 168 Wn.2d at 295. The court rejected Sieyes's claim, stating he "fail[ed] to provide convincing authority supporting an

19

original meaning of the Second Amendment which would grant all children an unfettered right to bear arms." *Sieyes*, 168 Wn.2d at 295.

In *Jorgenson*, a five-justice majority determined that the challenged law must be " 'reasonably necessary to protect public safety or welfare, and substantially related to legitimate ends sought.' " 179 Wn.2d at 156 (quoting *City of Seattle v. Montana*, 129 Wn.2d 583, 594, 919 P.2d 1218 (1996)). To make that determination, courts must " 'balanc[e] the public benefit from the regulation against the degree to which it frustrates the purpose of the constitutional provision.' " *Jorgenson*, 179 Wn.2d at 156 (alteration in original) (quoting *Montana*, 129 Wn.2d at 594). Under this test, the court affirmed a law prohibiting Jorgenson from possessing firearms while on bond after being charged with first degree assault for shooting someone. *Jorgenson*, 179 Wn.2d at 148-49, 157-58.

### a. Standard of Review

Craven first requests that this court disregard the test laid out in *Jorgenson* and instead apply strict scrutiny. We decline to do so.

A dissenting opinion is not binding authority. *Roberts v. Dudley*, 140 Wn.2d 58, 76 n.13, 993 P.2d 901 (2000). An appellate court, however, is bound by Supreme Court precedent. *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984). A five-justice majority is precedential. *Norg v. City of Seattle*, 200 Wn.2d 749, 757, 522 P.3d 580 (2023).

Here, Craven references two authorities to support his request: both dissents authored by the same judge. *Jorgenson*, in contrast, was decided by a five-justice majority, making it binding precedent. We do not find Craven's

analysis persuasive, and in addition, this court lacks the authority to disregard *Jorgenson* and apply strict scrutiny instead. We continue the analysis under *Jorgenson*.

### b. Constitutionality

Applying the *Jorgenson* standard, we conclude that the statutes at issue are reasonably necessary to protect public safety and substantially related to the legitimate ends sought.

Again, "a statute is presumed to be constitutional and a party challenging its constitutionality bears the burden of proving its unconstitutionality beyond a reasonable doubt." *State v. Myles*, 127 Wn.2d 807, 812, 903 P.2d 979 (1995). And RCW 9.41.040(1) and RCW 46.61.502(6)(a) prohibit an individual convicted three or more times for driving under the influence in the past 10 years from possessing a firearm.

"Public safety and welfare are necessarily implicated in any circumstance involving firearms because it is widely understood that guns pose an inherent danger to people and property." *Fort Discovery Corp. v. Jefferson County*, No. 53245-0-II, slip op. at 22 (Wash. Ct. App. Sep. 9, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2053245-0-II%20Unpublished%20Opinion.pdf. And this court has previously held that prohibiting the possession of firearms by convicted felons is a "reasonable regulation." *State v. Krzeszowski*, 106 Wn. App. 638, 641, 24 P.3d 485 (2001).

Here, Craven fails to establish unconstitutionality beyond a reasonable doubt.

To begin, the State clearly has an interest in protecting the public from the risk of firearm violence. The statutes at issue then only restrict firearm possession for those convicted of serious offenses. And as this court has previously determined, such restrictions are reasonable regulations. Prohibiting those convicted of serious offenses from carrying weapons that make it significantly easier to do harm is reasonably necessary to protect public safety.

Next, we conclude that the restrictions are substantially related to the legitimate ends sought. Craven contends that just because a person drives while intoxicated does not mean that person has a greater risk of improperly using a firearm. But repeated infractions for driving while intoxicated does indicate a willingness to repeatedly endanger the lives of others. And a variety of case law demonstrates the intersection of alcohol misuse and gun violence.

*Mortenson v. Moravec*, 1 Wn. App. 2d 608, 406 P.3d 1178 (2017), for example, provides that a firearm seller may be liable for providing a gun to an intoxicated person. This indicates that intoxication increases the likelihood of gun misuse. In fact, *Mortenson* focuses on the legislature's "increasing concern with preventing the combination of alcohol and firearms." 1 Wn. App. 2d at 625.

*Second Amendment Foundation v. City of Renton*, 35 Wn. App. 583, 668 P.2d 596 (1983), also draws a connection between alcohol misuse and gun violence, supporting the regulation of firearms in places where alcohol is served. Relying on an earlier standard, *Second Amendment Foundation* even determines that "[t]he benefit to public safety by reducing the possibility of armed conflict

22

while under the influence of alcohol outweighs the general right to bear arms."
35 Wn. App. at 586.

Although neither case speaks directly to driving under the influence and gun misuse, they do outline the relationship between intoxication and gun violence. Accordingly, restricting gun rights in individuals repeatedly convicted of driving while intoxicated is substantially related to protecting the public from gun violence. Craven's distinction between driving while intoxicated and gun misuse, unsupported by authority, does not establish unconstitutionality beyond a reasonable doubt.

And finally, we conclude that the public benefits from the regulation outweigh the degree to which it frustrates the purpose of the constitutional provision. As detailed above, demonstrable benefits occur by restricting a convicted felon's firearm rights. And to the frustration of purpose, Craven, and other such offenders, have the ability to restore their firearm rights. In fact, Craven previously had his gun rights restored after a different felony conviction, evidencing that the statutory restriction is not necessarily permanent. Given the extent of the State's interest in protecting the public from gun violence and the non-permanence of the firearm right restrictions, the benefits outweigh the degree of frustration.

We conclude that the statutes at issue do not violate article I, section 24 of the Washington State Constitution.

## LFOs

Lastly, Craven contends that the emergency response fee, Title 46 fee, toxicology lab fee, and victim penalty assessment (VPA) should be stricken based on his indigency. We uphold the VPA fee but remand to strike the remaining fees.

### 1. Emergency Response Fee

RCW 38.52.430 authorizes an emergency response recovery fee when a court finds an individual guilty of causing an incident that resulted in an emergency response. Upon a finding that the expenses were reasonable, the court shall order the defendant to reimburse the public agency responsible for the emergency response. RCW 38.52.430.

The State concedes that the trial court never made a finding that the expenses were reasonable. Without such a finding, the fee was not properly imposed. We remand for the trial court to strike the emergency response fee.

### 2. Title 46 Fee

RCW 46.64.055(1) requires that a court impose an additional $50 penalty for a felony conviction in violation of Title 46. The trial court may waive this fee, however, if the court finds the defendant to be indigent. RCW 46.64.055(1).

The State concedes that Craven has now established indigency. We remand for the trial court to strike the Title 46 fee.

### 3. Toxicology Lab Fee

RCW 46.61.5054(1) provides that a court must impose a $250 fee on all alcohol offenders. The fee is discretionary and may be suspended if the person being sentenced is indigent. RCW 46.61.5054(1)(b).

Again, the State concedes that Craven has now established indigency. We remand for the trial court to strike the toxicology lab fee.

### 4. VPA

RCW 7.68.035 requires a court to impose a victim penalty assessment unless the court finds the defendant indigent "at the time of sentencing."

Craven contends that because the court found Craven has now established indigency, we should remand for the trial court to strike the VPA. The State disagrees, noting that Craven was not indigent "at the time of sentencing," as required by statute.

Craven emphasizes that the court did not determine that Craven was "not indigent," and simply did not address the issue. But Craven was represented by two private attorneys throughout trial and indicated at sentencing that he was employed and had worked consistently in construction for the past 20 years. The court specifically noted that he appeared to be financially secure, stating, "You were able to hire these two. . . among the very best counsel. . . [s]o you have some resources. You are residentially secure. You have got a job. You are secure, according to your lawyers."

Given the court's consideration of Craven's finances and the lack of finding of indigency, the court did not err by imposing the VPA fee.

We affirm the convictions but remand for the trial court to strike the emergency response fee, Title 46 fee, and toxicology lab fee.

WE CONCUR: